# PITTSBURGH & LAKE ERIE RAILROAD CO. *v.* RAILWAY LABOR EXECUTIVES' ASSOCIATION

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 87-1589.   Argued March 29, 1989—Decided June 21, 1989*

---

*Together with No. 87-1888, *Pittsburgh & Lake Erie Railroad Co.* v. *Railway Labor Executives' Association et al.*, also on certiorari to the same court.

*Richard L. Wyatt, Jr.*, argued the cause for petitioner. With him on the briefs were *Ronald M. Johnson, Charles L. Warren, Eric D. Witkin*, and *G. Edward Yurcon*.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance in both cases. With him on the brief were *Solicitor General Fried* and *Deputy Solicitor General Merrill*.

*John O'B. Clarke, Jr.*, argued the cause for respondents. With him on the brief for respondent Railway Labor Executives' Association was *William G. Mahoney*. *Robert S. Burk, Henri F. Rush*, and *John J. McCarthy, Jr.*, filed a brief for the Interstate Commerce Commission, respondent in No. 87–1888.†

---

†Briefs of *amici curiae* urging reversal in both cases were filed for the State of South Dakota by *Richard A. Allen* and *Julie A. Tigges;* and for the National Railway Labor Conference by *Richard T. Conway, Ralph J.*

Justice White delivered the opinion of the Court.

These cases involve the interaction of three federal statutes with respect to the proposed sale of the rail line of the Pittsburgh and Lake Erie Railroad Co. (P&LE). The statutes are the Railway Labor Act (RLA), 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.;* the Interstate Commerce Act (ICA), 49 U. S. C. § 10101 *et seq.* (1982 ed. and Supp. V); and the Norris-LaGuardia Act (NLGA), 47 Stat. 70, 29 U. S. C. § 101 *et seq.*

## I

Petitioner, P&LE, is a small rail carrier owning and operating 182 miles of rail line serving points in Ohio and western Pennsylvania and possessing trackage rights over other lines extending into New York. P&LE has experienced financial problems of increasing severity, having lost $60 million during the five years preceding the onset of these cases. After other efforts to improve its condition failed, notably work force reductions, concessions from its employees, and market expansion, P&LE decided that in order to recoup for its owners any part of their investments it must sell its assets.[1] On July 8, 1987, P&LE agreed to sell its assets for

*Moore, Jr., D. Eugenia Langan,* and *David P. Lee.* Briefs of *amici curiae* urging reversal in No. 87–1888 were filed for the Airline Industrial Relations Conference by *Harry A. Rissetto* and *Thomas E. Reinert, Jr.;* for Chicago & North Western Transportation Co. et al. by *Ralph J. Moore, Jr., D. Eugenia Langan, James P. Daley, Stuart F. Gassner,* and *Robert J. Corber;* and for Guilford Transportation Industries, Inc., et al. by *Ralph J. Moore, Jr.,* and *D. Eugenia Langan.*

*David Silberman* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance in No. 87–1589.

*Mark M. Levin* filed a brief for the Regional Railroads of America et al. as *amici curiae* in both cases.

[1] Attempts to interest major rail lines in the property were unavailing because of the high cost of labor protection that would have been mandatory under the section of the ICA applicable to purchases by an existing carrier. 49 U. S. C. § 11347 (1982 ed., Supp. V), which is set forth in n. 7, *infra.*

approximately $70 million to a newly formed subsidiary, P&LE Rail Co., Inc. (Railco), of Chicago West Pullman Transportation Corporation (CWP).[2]   Railco intended to operate the railroad as P&LE had except that Railco would not assume P&LE's collective-bargaining contracts with its various unions and would need only about 250 employees rather than the 750 then working for P&LE.[3]   When the unions representing P&LE's employees were notified of the proposed sale, they asserted that the sale would have an effect on the working conditions of the carrier's employees and therefore was subject to the requirements of the RLA, 45 U. S. C. §§ 152 Seventh and 156, which provide:

"§ 152 . . . Seventh.   Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden

"No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."

"§ 156.   Procedure in changing rates of pay, rules, and working conditions

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice.   In every case where such notice of intended change has been given, or conferences are

---

[2] P&LE would keep certain real estate and some 6,000 railcars.

[3] CWP anticipated inviting all P&LE employees to submit applications and intended to give preference to them in hiring.   CWP also expected to bargain for new contracts with the existing unions.

being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."[4]

The unions advised that they stood ready to negotiate all aspects of the matter, including the decision to sell the railroad assets. P&LE responded that it was willing to discuss the matter but that § 156 notice and bargaining were not required since the transaction was subject to the jurisdiction of the Interstate Commerce Commission (ICC or Commission)

---

[4] Disputes about proposals to change rates of pay, rules, or working conditions are known as major disputes. Minor disputes are those involving the interpretation or application of existing contracts. The latter are subject to compulsory arbitration. The former are subject to the procedures set out in §§ 156 and 155, which specify the functions of the Mediation Board. In *Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 378 (1969), we described the procedures applicable to major disputes:

"The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates, pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo*. §§ 2 Seventh, 5 First, 6, 10."

under the ICA and since the requirements of §§ 155 and 156 would intrude on that regime as well as upon management's prerogatives to conduct the affairs of the company with respect to the sales transaction.

Most of the unions then responded by themselves filing § 156 notices proposing changes in existing agreements to ameliorate the adverse impacts of the proposed sale upon P&LE's employees. The unions sought guarantees that the sale would not cause any employee to be deprived of employment or to be placed in any worse position with respect to pay or working conditions and that P&LE would require that the purchaser of its rail line assume P&LE's collective-bargaining agreements.[5] P&LE again declined to bargain, asserting that the transaction was within the exclusive jurisdiction of the ICC. On August 19, respondent, Railway Labor Executives' Association (RLEA), on behalf of P&LE's unions, filed suit in the United States District Court for the Western District of Pennsylvania, seeking a declaratory judgment with respect to P&LE's obligations under the RLA

---

[5] The unions' proposals were essentially these:

"1. No employee of the P&LE Railroad Company who [was actively employed or on authorized leave of absence] between August 1, 1986 and August 1, 1987 . . . shall be deprived of employment or placed in a worse position with respect to compensation or working conditions for any reason except resignation, retirement, death or dismissal for justifiable cause. . . . The formulae for the protective allowances, with a separation option, shall be comparable to those established in the *New York Dock* conditions.

"2. If an employee is placed in a worse position with respect to compensation or working conditions, that employee shall receive, in addition to a make-whole-remedy, penalty pay equal to three times the lost pay, fringe benefits and consequential damages suffered by such employee.

"3. P&LE agrees to obtain binding commitments from any purchaser of its rail line operating properties and assets to assume all [of P&LE's] collective bargaining agreements . . . to hire P&LE employees in seniority order without physicals, and to negotiate with the P&LE and this Organization an agreement to apply this Agreement to the sale transaction and to select the forces to perform the work over the lines being acquired." App. 38, 42, 46, 50, 54, 58, 62, 66, 122, 126.

and an injunction against the sale pending completion of RLA bargaining obligations. On September 15, 1987, the unions went on strike. P&LE's request for a restraining order against the strike was denied by the District Court on the ground that the NLGA forbade such an order.[6]

The proposed sale of assets could not be carried out without compliance with the terms of the ICA, 49 U. S. C. § 10901, which requires that noncarriers seeking to acquire a rail line first obtain a certificate of public convenience and necessity from the ICC. Section 10901(e) specifies the procedures for this purpose and provides that the ICC "may" require the acquiring company "to provide a fair and equitable arrangement for the protection of railroad employees who may be affected thereby no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this title."[7] Section 10505, however,

---

[6] Section 4 of the NLGA, as set forth in 29 U. S. C. § 104, provides in part:

"§ 104. Enumeration of specific acts not subject to restraining orders or injunctions

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment . . . ."

Section 8 of that Act, as set forth in 29 U. S. C. § 108, is also relevant here:

"§ 108. Noncompliance with obligations involved in labor disputes or failure to settle by negotiation or arbitration as preventing injunctive relief

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

[7] Title 49 U. S. C. § 11347 (1982 ed., Supp. V) requires labor protective provisions when a rail carrier is involved in certain transactions such as mergers or consolidations:

authorizes the Commission to grant exemptions from the requirements of the Act when not necessary to carry out the national transportation policy.[8] Based on its experience with acquisitions under § 10901, the ICC had issued what is known as the Ex Parte No. 392 Class Exemption, see *Ex Parte No. 392 (Sub. No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U. S. C. 10901,*

---

"§ 11347.  Employee protective arrangements in transactions involving rail carriers

"When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U. S. C. 565).  Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees.  The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period)."

[8] Section 10505 provides in part:

"§ 10505.  Authority to exempt rail carrier transportation

"(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

"(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

"(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

.         .         .         .         .

"(g) The Commission may not exercise its authority under this section . . . (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle."

1 I. C. C. 2d 810 (1985) *(Ex Parte 392)*, review denied *sub nom. Illinois Commerce Comm'n* v. *ICC*, 260 U. S. App. D. C. 38, 817 F. 2d 145 (1987),[9] which provides abbreviated procedures for seeking approval for acquisitions by non-carriers such as Railco of an operating railroad or its assets. The regulatory procedure, see 49 CFR § 1150.32(b) (1987), involved the filing of an application for exemption which would become effective seven days after filing absent contrary notice from the Commission.[10] An interested party could op-

_____

[9] The Commission's brief in this Court provides this background:

"In the years just after the partial deregulation of the railroad industry occasioned by the passage of the Staggers Rail Act of 1980, Pub. L. No. 96–448, 94 Stat. 194–45, numerous new short lines and regional rail lines were created, pursuant to 49 U. S. C. 10901, through the sale of marginally profitable and unprofitable rail lines to new entities eager to provide rail service. In considering and approving these sales, the Commission became convinced that the expense imposed on such sales by the imposition of labor protective conditions was hampering the development of short line railroads and, indeed, was forcing the selling carriers to abandon these marginal lines pursuant to 49 U. S. C. 10903 of the ICA.

"In order to foster the development of short line railroads to preserve rail facilities, service and employment that would otherwise be lost through abandonments, the Commission began withholding labor protections in individual sales. After considering over five years many such applications, the Commission determined that the formation of new rail carriers should be encouraged. In order to aid rail formations, the Commission promulgated the procedures in Ex Parte No. 392. In *Ex Parte 392* the Commission exempted rail line sales to new carriers from full compliance with Commission procedures while retaining authority, under its revocation power, to review the transaction and correct any problem arising out of the transaction." Brief for Interstate Commerce Commission 3–4 (footnote and citations omitted).

In the *Ex Parte 392* proceedings, the RLEA demanded that the Commission impose labor conditions in all § 10901 sale transactions. The Commission, however, ruled that labor protective provisions would be imposed in individual cases only upon a showing of exceptional circumstances. 1 I. C. C. 2d, at 815.

[10] The ICC modified the *Ex Parte 392* procedure in 1988 to extend the waiting period from 7 to 35 days. See 53 Fed. Reg. 5981–5982 (1988).

pose the exemption by filing a petition to revoke at any time, after consideration of which the ICC could revoke the exemption in whole or in part or impose labor protective provisions. The ICC had indicated, however, that only in exceptional situations would such protective provisions be imposed.

Accordingly, Railco on September 19, 1987, filed a notice of exemption pursuant to *Ex Parte 392*. After denying various requests by the unions to reject the notice of exemption and stay the sale, the Commission allowed the exemption to become effective on September 26. A petition to revoke filed by RLEA on October 2 is still pending before the Commission. At no time did RLEA request imposition of labor protective provisions pursuant to the Commission's authority under § 10901.[11]

On October 5, 1987, P&LE reapplied to the District Court for an order restraining the strike. The District Court granted the request on October 8, ruling that the authorization of the sale by the ICC negated any duty that P&LE had to bargain over the effects of the sale on its employees, and that the NLGA did not forbid issuance of an injunction under such circumstances.[12] On October 26, however, the Court of Appeals summarily reversed, holding that the ICA did not require accommodation of the NLGA's restrictions on the District Court's powers. 831 F. 2d 1231 (CA3 1987). A remand was ordered to determine whether the sale or strike violated the RLA. The unions did not resume their strike when the Court of Appeals reversed the District Court's injunction, but threatened to do so if P&LE attempted to consummate the sale to Railco.[13]

---

[11] See n. 7, *supra*.

[12] The order was to remain in effect until the District Court ruled on the preliminary injunction sought by P&LE. It was this order that was reviewed by the Court of Appeals.

[13] The strike and the decisions of the Court of Appeals effectively terminated the proposed sale to Railco. Efforts to find another buyer were unsuccessful, but since P&LE is still interested in selling its assets and the

The case in the District Court then went forward. Addressing the unions' request for an injunction, the District Court held that although P&LE did not have a duty to bargain over its decision to sell, P&LE was required by the RLA to bargain over the effects of the sale on employees, and that the status quo provision of § 156 required that its bargaining obligations under the RLA must be satisfied before the sale could be consummated despite approval of the transaction by the ICC acting pursuant to the ICA. 677 F. Supp. 830 (WD Pa. 1987). A divided Court of Appeals affirmed the judgment of the District Court. 845 F. 2d 420 (CA3 1988).

We granted P&LE's petition in No. 87–1888, challenging the Court of Appeals' affirmance of the injunction against the sale issued by the District Court, as well as P&LE's petition in No. 87–1589, asking for reversal of the judgment of the Court of Appeals setting aside the strike injunction issued by the District Court. 488 U. S. 965 (1988).

## II

In No. 87–1888, the issue is whether the RLA, properly construed, required or authorized an injunction against closing the sale of P&LE's assets to Railco because of an unsatisfied duty to bargain about the effects of the sale on P&LE's employees. We first address whether the RLA required P&LE to give notice of its decision to sell and to bargain about the effects of the sale. We then consider whether the unions' own notices and the status quo provision of § 156 justified the injunction.

---

issues in these cases have a bearing on those efforts, the cases, as the Court of Appeals recognized and the parties agree, are not moot.

Also, in late September, P&LE and its unions had informal exchanges about the effects of the sale. On October 14, one of the unions invoked the services of the Mediation Board. After the April 8, 1988, Court of Appeals decision, 845 F. 2d 420 (CA3), effects bargaining proceeded, and as these cases indicate, the parties have not resolved their differences.

## A

P&LE submits that neither its decision to sell nor the impact that sale of the company might have had on its employees was a "change in *agreements* affecting rates of pay, rules, or working conditions" (emphasis added) within the meaning of the RLA, 45 U. S. C. § 156, and that P&LE therefore had no duty to give notice or to bargain with respect to these matters.   The Court of Appeals rejected this submission, focusing on the effects the sale would have on employees and concluding that the "loss of jobs by possibly two-thirds of the employees clearly would require a 'change in agreements affecting rates of pay, rules, or working conditions.'"   845 F. 2d, at 428.   The court did not point out how the proposed sale would require changing any specific provision of any of P&LE's collective-bargaining agreements.   It did not suggest that any of those agreements dealt with the possibility of the sale of the company, sought to confer any rights on P&LE's employees in the event of the sale, or guaranteed that jobs would continue to be available indefinitely.[14]   What P&LE proposed to do would remove it from the railroad business and terminate its position as a railroad employer; and like the Court of Appeals, RLEA does not explain how such action would violate or require changing any of the provisions of the unions' written contracts with P&LE.

Of course, not all working conditions to which parties may have agreed are to be found in written contracts.   *Detroit & Toledo Shore Line R. Co.* v. *Transportation Union,* 396 U. S. 142, 154–155 (1969) *(Shore Line).*   It may be that

---

[14] Indeed, the Court of Appeals stated that "P&LE's agreements with its unions, however, do not appear to contemplate this type of transaction [*i. e.*, sale of the rail lines], and thus neither expressly permit nor prohibit the sale."   845 F. 2d, at 428, n. 9.   RLEA asserts that P&LE had granted job security guarantees to some of its employees, see Brief for Respondent RLEA 3, but the record does not contain the collective-bargaining contracts, and if there were such guarantees, there is no claim that they would survive the sale of the rail line.

"in the context of the relationship between the principals, taken as a whole, there is a basis for implying an understanding on the particular practice involved." *Id.*, at 160 (Harlan, J., dissenting). But the Court of Appeals did not purport to find an implied agreement that P&LE would not go out of business, would not sell its assets, or if it did, would protect its employees from the adverse consequences of such action. Neither does RLEA. We therefore see no basis for holding that P&LE should have given a § 156 notice of a proposed "change" in its express or implied agreements with the unions when it contracted to sell its assets to Railco. Nor was it, based on its own decision to sell, obligated to bargain about the impending sale or to delay its implementation. We find RLEA's arguments to the contrary quite unconvincing.

### B

There is more substance to the Court of Appeals' holding, and to RLEA's submission, that the unions' § 156 notices proposed far-reaching changes in the existing agreements over which P&LE was required to bargain and that the status quo provision of § 156 prohibited P&LE from going forward with the sale pending completion of the "purposely long and drawn out" procedures which the Act requires to be followed in order to settle a "major" dispute. *Railway Clerks* v. *Florida East Coast R. Co.*, 384 U. S. 238, 246 (1966). Section 156 provides that when a notice of change in agreements has been given, "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155." Relying on *Shore Line*, RLEA argues, and the Court of Appeals held, that when a rail labor union files a § 156 notice to change the terms of an agreement, the "working conditions" that the carrier may not change pending conclusion of the bargaining process are not limited to those contained in express or implied agreements but include, as *Shore Line* held, "those actual, objective working conditions and practices, broadly con-

ceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." 396 U. S., at 153. RLEA submits that the relationship of employer-employee and the state of being employed are among those working conditions that may not be changed until the RLA procedures are satisfied. We are unconvinced, for several reasons, that this is the case.

The facts of *Shore Line*, briefly stated, were these: Shore Line operated 50 miles of rail line between Lang Yard in Toledo, Ohio, and Dearoad Yard near Detroit, Michigan. For many years, all train and engine crews reported for duty and finished the day at Lang Yard. When it was necessary to perform switching and other operations at other points, crews were transported at railroad expense to those outlying points. The company proposed to establish outlying work assignments at Trenton, Michigan, some 35 miles north of Lang Yard. Crews assigned there would have to report there. The proposed change was not forbidden by, and would not have violated, the parties' collective-bargaining agreement. The union filed a § 156 notice seeking to amend the agreement to forbid the railroad to make outlying assignments. The issue was not settled by the parties and the union called for mediation. While the Mediation Board proceedings were pending, the railroad posted a bulletin creating the disputed assignment at Trenton. The union threatened a strike, the company sued to restrain the strike, and the union counterclaimed for an injunction relying on the status quo provision of § 156. The District Court and the Court of Appeals held for the union, and we affirmed over a dissent by Justice Harlan, joined by Chief Justice Burger. We held that even though Shore Line did not propose to change any of its agreements, the status quo provision of § 156—"rates of pay, rules, or working conditions shall not be altered" pending exhaustion of the required procedure—forbade any change by Shore Line in the "objective working conditions" then existing. 396 U. S., at 153. We noted that had it been

the practice to make outlying work assignments, the company would have been within its rights to make the Trenton assignment; but the prior practice, the objective working condition, was to have crews report for work and come back to Lang Yard. That working condition could not be changed pending resolution of the dispute without violating the status quo provision of § 156 even though there was nothing in the agreement between the parties to prevent outlying assignments. *Id.*, at 153–154.

*Shore Line*, in our view, does not control these cases. In the first place, our conclusion in that case that the status quo provision required adherence not only to working conditions contained in express or implied agreements between the railroad and its union but also to conditions "objectively" in existence when the union's notice was served, and that otherwise could be changed without violating any agreement, extended the relevant language of § 156 to its outer limits, and we should proceed with care before applying that decision to the facts of these cases.[15] Second, reporting at Lang Yard, we thought, had been the unquestioned practice for many years, and we considered it reasonable for employees to deem it sufficiently established that it would not be changed without bargaining and compliance with the status quo provisions of the RLA.

---

[15] Section 156 deals with bargaining and settlement procedures with respect to changes in *agreements* affecting rates of pay, rules, or working conditions. There must be notice of such intended changes, as well as bargaining and mediation if requested or proffered. And in every case involving *such* notice, *i. e.*, of intended changes in *agreements*, rates of pay, rules or working conditions shall not be changed by the carrier until the specified procedures are satisfied. Because § 156 concerns changes in agreements, it is surely arguable that it is open to a construction that would not require the status quo with respect to working conditions that have never been the subject of an agreement, expressed or implied, and that, if no notice of changes had been served by the union, could be changed by the carrier without any bargaining whatsoever. *Shore Line* rejected that construction, but as indicated in the text, we are not inclined to apply *Shore Line* to the decision of P&LE to go out of business.

Third, and more fundamentally, the decision did not involve a proposal by the railroad to terminate its business. Here, it may be said that the working condition existing prior to the § 156 notice was that P&LE was operating a railroad through the agency of its employees, but there was no reason to expect, simply from the railroad's long existence, that it would stay in business, especially in view of its losses, or that rail labor would have a substantial role in the decision to sell or in negotiating the terms of the sale. Whatever else *Shore Line* might reach, it did not involve the decision of a carrier to quit the railroad business, sell its assets, and cease to be a railroad employer at all, a decision that we think should have been accorded more legal significance than it received in the courts below. Our cases indicate as much.

In *Textile Workers* v. *Darlington Mfg. Co.*, 380 U. S. 263 (1965), an employer closed its textile mill when a union won a representation election. The National Labor Relations Board concluded that this action was an unfair labor practice under §§ 8(a)(1) and (3) of the National Labor Relations Act (NLRA). The Court of Appeals disagreed, holding that the complete or partial liquidation of an employer's business even though motivated by antiunion animus was not an unfair practice. We affirmed in part,[16] ruling that insofar as the NLRA is concerned, an employer "has an absolute right to terminate his entire business for any reason he pleases. . . ." 380 U. S., at 268. Whatever may be the limits of § 8(a)(1), we said, an employer's decision to terminate its business is one of those decisions "so peculiarly matters of management prerogative that they would never constitute violations" of that section. *Id.*, at 269. Neither would ceasing business and refusing to bargain about it violate § 8(a)(3) or § 8(a)(5) even if done with antiunion animus. *Id.*, at 267, n. 5, 269–274. "A proposition that a single businessman cannot choose to go out of business if he wants to would represent

---

[16] We thought that a partial liquidation might present a different case and remanded for further findings. See 380 U. S., at 268, 276–277.

such a startling innovation that it should not be entertained without the clearest manifestation of legislative intent or unequivocal judicial precedent so construing the Labor Relations Act." *Id.*, at 270. We found neither.[17]

---

[17] In *First National Maintenance Corp.* v. *NLRB*, 452 U. S. 666 (1981), which, like *Textile Workers* v. *Darlington Mfg. Co.*, arose under the NLRA, we concluded that "the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." 452 U. S., at 686. Further, we held that the employer's decision to close down a segment of its business "is *not* part of § 8 (d)'s 'terms and conditions,' . . . over which Congress has mandated bargaining." *Ibid.* In so holding, we did not feel constrained by the Court's decision in *Railroad Telegraphers* v. *Chicago & N. W. R. Co.*, 362 U. S. 330 (1960). Indeed, we rejected the argument that *Telegraphers* compelled us to find bargaining over this decision mandatory. Although we pointed in *First National Maintenance* to the important distinctions between the RLA and the NLRA, there are other reasons why *Telegraphers* does not dictate the result in these cases. In *Telegraphers*, the Court held that the District Court was without jurisdiction to grant injunctive relief against a labor strike under the provisions of the NLGA. A closely divided Court reasoned that a railroad's proposal to abandon certain single-agent stations and hence abolish some jobs was a bargainable issue. In *Darlington* and *First National Maintenance*, we concluded that the analysis in *Telegraphers*, which rested on an "expansive" reading of the RLA and the NLGA, did not govern a decision under the NLRA. 452 U. S., at 687, n. 23. In this case, we examine *Telegraphers* once again in the context of the RLA. In *Telegraphers* a railroad was seeking simply to eliminate or consolidate some of its little-used local stations. The railroad here, by contrast, sought to sell all its lines and go out of business. There is nothing in *Telegraphers* that forces us to reach the result, in this extreme case, that P&LE was prohibited from terminating its operations without first bargaining with the unions. Notwithstanding the policy considerations prompting the enlarged scope of mandatory bargaining under the RLA, in light of *Darlington*, which *First National Maintenance* reaffirmed, we are not inclined to extend *Telegraphers* to a case in which the railroad decides to retire from the railroad business.

The dissent, *post*, at 518–520, seems to assert that *Shore Line* and *Telegraphers* dealt with a railroad's freedom to leave the market. But as we point out, that is precisely what those cases did not involve. We are

Although *Darlington* arose under the NLRA, we are convinced that we should be guided by the admonition in that case that the decision to close down a business entirely is so much a management prerogative that only an unmistakable expression of congressional intent will suffice to require the employer to postpone a sale of its assets pending the fulfillment of any duty it may have to bargain over the subject matter of union notices such as were served in this litigation. Absent statutory direction to the contrary, the decision of a railroad employer to go out of business and consequently to reduce to zero the number of available jobs is not a change in the conditions of employment forbidden by the status quo provision of § 156. In these cases, P&LE concluded that it must sell its assets, and its agreement to sell to Railco, if implemented, would have removed it from the railroad business; no longer would it be a railroad employer. No longer would it need the services of members of the rail unions. The RLEA concedes that had the collective-bargaining agreements expressly waived bargaining concerning sale of P&LE's assets, the unions' § 156 notices to change the agreements could not trump the terms of the agreements and could not delay the sale. Brief for Respondent RLEA 44. We think the same result follows where the agreement is silent on the matter and the railroad employer has proceeded in accordance with the ICA. In these circumstances, there is little or no basis for the unions to expect that a § 156 notice would be effective to delay the company's departure from the railroad business. Congress clearly requires that sales transactions like P&LE's proposal must satisfy the requirements of the ICA, but we find nothing in the RLA to prevent the immediate consummation of P&LE's contract to sell. When the ICC approved the sale by permitting the *Ex Parte 392* exemption to become effective, P&LE was free to close the transaction and should not have been enjoined from doing so.

plainly at odds with the dissent with respect to the significance of P&LE's decision to leave the railroad business.

This construction of the RLA also responds to our obligation to avoid conflicts between two statutory regimes, namely, the RLA and ICA, that in some respects overlap. As the Court has said, we "are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974). We should read federal statutes "to give effect to each if we can do so while preserving their sense and purpose." *Watt* v. *Alaska*, 451 U. S. 259, 267 (1981); see also *United States* v. *Fausto*, 484 U. S. 439, 453 (1988). We act accordingly in this litigation.

Congress has exercised its Commerce Clause authority to regulate rail transportation for over a century. See Act to regulate commerce of 1887 (the ICA), ch. 104, 24 Stat. 379. In doing so, Congress has assigned to the ICC plenary authority over rail transactions, ranging from line extensions, consolidations, and abandonments, to acquisitions. In particular, the ICA in 49 U. S. C. § 10901(a) permits noncarriers to acquire a rail line only if the ICC determines that "the present or future public convenience and necessity require or permit" the rail acquisition and operation. The ICC may approve certification on satisfaction of various conditions. Specifically, it has authority to impose labor protection provisions though it is not obligated to do so. § 10901(e). Acting pursuant to § 10505, the ICC, in its *Ex Parte 392* exemption proceedings, declared all noncarrier acquisitions presumptively exempt from § 10901 regulation. Such transactions would be deemed approved seven days after a notice filed by the acquiring entities. 49 CFR § 1150.32(b) (1987). And absent a showing of exceptional circumstances, which rail labor was entitled to demonstrate, labor protection provisions would not be imposed. The *Ex Parte 392* procedures, and the ICA, § 10505 exemption authority generally, like amendments to ICA in the last two

decades, see, *e. g.*, the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. 94–210, 90 Stat. 31; the Staggers Rail Act of 1980, Pub. L. 96–448, 94 Stat. 1895, aimed at reversing the rail industry's decline through deregulatory efforts, above all by streamlining procedures to effectuate economically efficient transactions.

Here P&LE agreed to sell its assets to Railco. The transaction was presented to the ICC and an *Ex Parte 392* exemption was requested. The ICC rejected the unions' applications to stay or reject the exemption, which became effective seven days after it was requested. The unions then successfully sought an injunction delaying the closing of the transaction based on their § 156 notices. The Court of Appeals several times noted the tension between the two regimes, but concluded that the provisions of the RLA left no room for a construction easing those tensions. This was the case even though the injunction that was affirmed would likely result in cancellation of P&LE's sale and the frustration of Congress' intent through ICA amendments to deregulate the rail and air industries generally and more specifically to assist small rail lines with financial problems. We disagree with that conclusion, for as we have said, we are confident that the RLA is reasonably subject to a construction that would, at least to a degree, harmonize the two statutes.[18] The injunction, which effectively prevented the sale from going forward, should not have been granted.

---

[18] P&LE argues that the RLA injunction was an impermissible collateral attack on the ICC order approving the sale. But the ICA, 49 U. S. C. § 10901, and the RLA, 45 U. S. C. § 156, as we construe them, are complementary regimes. Here, the ICC simply granted an exemption from the strictures of § 10901, which permitted, but did not order, the consummation of the sale. It made no finding that would prevent enforcement of § 156.

The dissent, *post*, at 515, asserts that we ignore the principle that P&LE, a regulated utility, may not enter or leave the market without agency approval. Of course, we do not, for we set out the law that requires ICC consent to the sale, which was obtained.

## C

Our holding in these cases, which rests on our construction of the RLA and not on the pre-emptive force of the ICA, is that petitioner was not obligated to serve its own § 156 notice on the unions in connection with the proposed sale. We also conclude that the unions' notices did not obligate P&LE to maintain the status quo and postpone the sale beyond the time the sale was approved by the Commission and was scheduled to be consummated. We do not hold, however, that P&LE had no duty at all to bargain in response to the unions' § 156 motions. The courts below held, and RLEA agrees, that P&LE's decision to sell, as such, was not a bargainable subject. The disputed issue is whether P&LE was required to bargain about the effects that the sale would or might have upon its employees. P&LE, in our view, was not entirely free to disregard the unions' demand that it bargain about such effects. When the unions' notices were served, however, the terms of P&LE's agreement with Railco were more or less settled, and P&LE's decision to sell on those terms had been made. To the extent that the unions' demands could be satisfied only by the assent of the buyers, they sought to change or dictate the terms of the sale, and in effect challenged the decision to sell itself. At that time, P&LE was under no obligation to bargain about the terms it had already negotiated. To the extent that the unions' proposals could be satisfied by P&LE itself, those matters were bargainable but only until the date for closing the sale arrived, which, of course, could not occur until the *Ex Parte 392* exemption became effective.[19] We are therefore constrained to reverse the Court of Appeals in No. 87–1888.

---

[19] We address the duty to bargain about the effects of the sale only in the context of the facts existing when the unions' notices were served. We do not deal with a railroad employer's duty to bargain in response to a union's § 156 notice proposing labor protection provisions in the event that a sale, not yet contemplated, should take place.

## III

In No. 87–1589, the issue is whether the Court of Appeals was correct in setting aside the injunction against the strike issued on October 8, 1987. At that time, the *Ex Parte 392* exemption had become effective, and the District Court held that because the ICC had in effect authorized the sale and had ruled that delay would be prejudicial to the parties and the public interests, the NLGA prohibition against issuing injunctions in labor dispute cases must be accommodated to the ICC's decision that the sale of assets should go forward. It was this decision, based on the legal significance of the ICA and its impact on the NLGA, that the Court of Appeals summarily reversed. We agree with that decision.

We have held that the NLGA § 4 general limitation on district courts' power to issue injunctions in labor disputes must be accommodated to the more specific provisions of the RLA: "[T]he District Court has jurisdiction and power to issue necessary injunctive orders" to enforce compliance with the requirements of the RLA "notwithstanding the provisions of the Norris-LaGuardia Act." *Trainmen* v. *Howard,* 343 U. S. 768, 774 (1952). Thus, a union may be enjoined from striking when the dispute concerns the interpretation or application of its contract and is therefore subject to compulsory arbitration. *Trainmen* v. *Chicago River & Indiana R. Co.,* 353 U. S. 30 (1957). "[T]he specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act." *Id.,* at 41–42. The same accommodation of the NLGA to the specific provisions of the NLRA must be made. A union that has agreed to arbitrate contractual disputes and is subject to a no-strike clause may be enjoined from striking despite the NLGA. *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235 (1970).

Petitioner contends that the NLGA must likewise be accommodated to the procedures mandated by Congress in 49 U. S. C. § 10901 specifically the authority of the ICC to impose labor protective provisions, the right of rail

labor to seek such provisions from the ICC, and its right to judicial review if dissatisfied. It is urged that the ICA provides a comprehensive scheme for the resolution of labor protection issues arising out of ICC-regulated transactions and that rail labor must take advantage of those procedures rather than strike. We are unpersuaded that this is the case.

The prohibition of the NLGA must give way when necessary to enforce a duty specifically imposed by another statute. But no applicable provision has been called to our attention that imposes any duty on rail unions to participate in ICC proceedings and to seek ICC protections with which they must be satisfied. Furthermore, labor protection provisions run against the acquiring railroad rather than the seller. Yet here it is with the seller, P&LE, that the unions wanted to bargain, seeking to ease the adverse consequences of the sale. To that end, the unions served §156 notices, which at least to some extent obligated P&LE to bargain until its transaction was closed. We find nothing in the ICA that relieved P&LE of that duty, nor anything in that Act that empowers the ICC to intrude into the relationship between the selling carrier and its railroad unions. We are thus quite sure that the NLGA forbade an injunction against that strike unless the strike was contrary to the unions' duties under the RLA.

As to that issue, the Court of Appeals stated: "We intimate no view as to whether the provisions of the Railway Labor Act are applicable to this dispute so that the district court would be entitled to enjoin the strike while that Act's dispute resolution mechanisms are underway. RLEA's complaint seeking a declaration that the Railway Labor Act is applicable to this dispute is the merits issue before the district court." 831 F. 2d, at 1237. On remand, the District Court held that the RLA was indeed applicable to the dispute and on that basis issued an injunction against P&LE. It did not, however, ever address the question whether the unions'

strike, which occurred after their suit was filed, was enjoinable under the RLA. Neither did the Court of Appeals deal with that issue in affirming the District Court. P&LE perfunctorily asserts in its briefs in this Court that the strike injunction was proper because the unions were obligated to bargain rather than strike after their § 156 notices were served. RLEA did not respond to this assertion. With the case in this position, we shall not pursue the issue. Instead, we vacate the judgment of the Court of Appeals, and leave the matter, if it is a live issue, to be dealt with on remand.

## IV

The judgment of the Court of Appeals in No. 87–1888 is reversed and the judgment in No. 87–1589 is vacated, and the cases are remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

Regulated utilities do not have the same freedom to respond to market pressures that unregulated firms have.[1] They may not raise rates or cut services, for example, without permission from a regulatory agency. Most significantly for these cases, they may neither enter nor leave the market without agency approval. Ignoring this principle, the Court in Part II of its opinion arrives at a result that, while perhaps preferable as a matter of policy, contradicts our previous interpretations of the relevant statute.[2]

---

[1] *E. g.,* D. Hjelmfelt, Antitrust and Regulated Industries § 1.3 (1985).
[2] Because I agree with the Court's factual description of these cases and its resolution of No. 87–1589, I join Parts I and III of its opinion.

The railroad industry long has been the subject of governmental regulation.[3]   A year after this Court held that individual States were powerless to regulate rail lines extending beyond their boundaries, *Wabash, S. L. & P. R. Co.* v. *Illinois*, 118 U. S. 557 (1886), Congress established the Interstate Commerce Commission (ICC) to regulate economic aspects of the rail industry.   Interstate Commerce Act, 49 U. S. C. § 10101 *et seq.* (1982 ed. and Supp. V).   Regulation of employment relationships within the rail industry followed,[4] and in 1926, Congress enacted the Railway Labor Act (RLA), 45 U. S. C. § 151 *et seq.*

The intervening six decades were marked by relatively peaceful coexistence between the two statutes.   During the course of the employment relationship, the RLA provided the means for resolving disputes.   See *ante,* at 496, n. 4; *Consolidated Rail Corporation* v. *Railway Labor Executives' Assn., ante,* at 302–304.   If a railroad sought to end that relationship by sale, consolidation, or abandonment, the ICC routinely conditioned approval on the railroad's acceptance of either job protection or some form of severance pay for employees who would be affected by the change.   See *United States* v. *Lowden,* 308 U. S. 225 (1939).[5]   Cf. *ante,* at 498.

---

[3] See W. Jones, Cases and Materials on Regulated Industries 7–11, 24–55 (2d ed. 1976); M. Glaeser, Public Utilities in American Capitalism 57–71 (1957); I. Sharfman, The Interstate Commerce Commission, pt. 1, pp. 11–35 (1931).

[4] See, *e. g.,* Hours of Service Act of 1907, as amended, 45 U. S. C. §§ 61–66; Employers' Liability Act of 1908, as amended, 45 U. S. C. §§ 51–60.   See also Sharfman 180–182; L. Lecht, Experience under Railway Labor Legislation 14–46 (1955).

[5] Labor protective provisions approved in *Lowden* included salary-level maintenance, preservation of seniority rights, and severance and relocation payments.   308 U. S., at 228.   In concluding that the ICC had the power to impose such conditions, Justice Stone wrote for the Court:

"One must disregard the entire history of railroad labor relations in the United States to be able to say that the just and reasonable treatment of railroad employees in mitigation of the hardship imposed on them in carrying out the national policy of railway consolidation, has no bearing on the

This symbiosis ended in 1985, when the ICC announced that it no longer would impose labor protective conditions on sales of short-line railroads unless exceptional circumstances were shown. *Ex Parte No. 392 (Sub. No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U. S. C. 10901*, 1 I. C. C. 2d 810, 815 (1985), review denied *sub nom. Illinois Commerce Comm'n v. ICC*, 260 U. S. App. D. C. 38, 817 F. 2d 145 (1987); see *ante*, at 498–501. Suddenly it became important for railroad unions to obtain such labor protections through collective bargaining. Unlike other employment contracts, however, rail labor agreements are altered not by periodic renegotiation but by notification, pursuant to § 6 of the RLA, 45 U. S. C. § 156, of a desire to change terms in the agreements. See Tr. of Oral Arg. 66–67. Thus it is not surprising that the unions in this litigation did not seek labor protective provisions until—just 18 months after the ICC abdicated its traditional protective role—plans to sell the railroad surfaced.[6]

There is no disagreement that labor protective provisions related to the effects of an abandonment or sale may be the subject of collective bargaining. It follows, I believe, that when railway labor unions request the inclusion of such pro-

---

successful prosecution of that policy and no relationship to the maintenance of an adequate and efficient transportation system." *Id.*, at 234.

See also *ICC v. Railway Labor Executives' Assn.*, 315 U. S. 373 (1942).

[6] The railroad might have had a greater duty to bargain, the Court suggests, had the unions served notice before sale negotiations had commenced. See *ante*, at 512, n. 19. Yet in the two opinions that I believe should control these cases, we did not fault the unions for filing § 6 notices in reaction to—rather than in anticipation of—the railroads' initiatives. Compare *Railroad Telegraphers v. Chicago & N. W. R. Co.*, 362 U. S. 330, 332 (1960), with *id.*, at 349 (Whittaker, J., dissenting) (majority rejects railroad's argument that § 6 notices were improper because filed after railroad petitioned state regulatory commissions for permission to abolish jobs). See also *Detroit & Toledo Shore Line R. Co. v. Transportation Union*, 396 U. S. 142, 146 (1969). In light of the ICC's abrupt halt to its practice of requiring labor protections, moreover, the Court's distinction unfairly penalizes the unions in this litigation.

visions in their collective-bargaining agreements by proper statutory notice, see *ante*, at 496–497, and n. 5, the employer must maintain the status quo during the statutorily mandated negotiating process or risk a strike as a consequence of its breach of that duty. See §§ 2 First, Seventh of the RLA, 45 U. S. C. §§ 152 First, Seventh. The Court admits the force of this proposition and acknowledges that an employer has some duty to bargain when a sale is announced. *Ante*, at 504, 512. Nevertheless, it indicates that this particular dispute did not obligate the railroad to preserve the status quo, for the Court would prohibit any bargaining that "in effect challenged the decision to sell," and would allow negotiations to cease as soon as the sale is closed. *Ante*, at 512.[7] This diminution of the employer's duty contravenes two of our decisions interpreting the RLA.

In *Railroad Telegraphers* v. *Chicago & N. W. R. Co.*, 362 U. S. 330 (1960), a railroad had decided, with the approval of state regulatory commissions, to abandon a large number of its local stations and thus remove several hundred station attendants from the payroll. This Court held that because the RLA "command[s] that employees as well as railroads exert every reasonable effort to settle all disputes 'concerning rates of pay, rules, and working conditions,'" the union had a right to strike to prevent the railroad from implementing the partial abandonment without bargaining over effects. *Id.*, at 339 (quoting § 2 First of the RLA, 45 U. S. C. § 152 First). The Court continued:

---

[7] The Court neglects to mention that a sale may be closed within a matter of months, whereas resort to RLA procedures may entail "virtually endless 'negotiation, mediation, voluntary arbitration, and conciliation.'" *Burlington Northern R. Co.* v. *Maintenance of Way Employes*, 481 U. S. 429, 444 (1987) (quoting *Shore Line*, 396 U. S., at 148–149). If the railroad knows its obligations will end when the sale is consummated, it will have no incentive to expedite bargaining. Thus the Court's imposition of a minimal bargaining duty affords employees scarcely more protection than they would have absent any duty.

"It would stretch credulity too far to say that the Railway Labor Act, designed to protect railroad workers, was somehow violated by the union acting precisely in accordance with that Act's purpose to obtain stability and permanence in employment for workers. There is no express provision of law, and certainly we can infer none from the Interstate Commerce Act, making it unlawful for unions to want to discuss with railroads actions that may vitally and adversely affect the security, seniority and stability of railroad jobs." 362 U. S., at 339–340.

*Telegraphers* thus holds that if management decides to abandon a significant part of a railroad's business, the impact of that decision on employees' job security is a proper subject for bargaining under the RLA.

*Detroit & Toledo Shore Line R. Co.* v. *Transportation Union,* 396 U. S. 142 (1969) *(Shore Line)*, concerned a railroad's proposal to make new work assignments, a change neither authorized nor prohibited by the collective-bargaining agreement. The Court held that once the union had served notice of its desire to bargain, the railroad was obligated to maintain the status quo until completion of the RLA's "'purposely long and drawn out'" bargaining process. *Id.*, at 149 (quoting *Railway Clerks* v. *Florida East Coast R. Co.*, 384 U. S. 238, 246 (1966)). It further rejected the railroad's argument that the "status quo" encompassed only working conditions expressed in an agreement between the parties:

"[T]he language of § 6 simply does not say what the railroad would have it say. Instead, the section speaks plainly of 'rates of pay, rules, or working conditions' without any limitation to those obligations already embodied in collective agreements. More important, we are persuaded that the railroad's interpretation of this section is sharply at variance with the overall design and purpose of the Railway Labor Act." 396 U. S., at 148.

The Court therefore construed "status quo" to mean "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.*, at 153.

Today the Court proffers three reasons why *Shore Line* does not control these cases. First, it asserts that the *Shore Line* holding that "status quo" includes "conditions 'objectively' in existence when the union's notice was served" stretched the language of the statute "to its outer limits," *ante*, at 506. I am not at all sure that is true; even if it is, the holding is unambiguous and has the force of law. Second, the Court suggests that the fact that the work assignment changed in *Shore Line* had been in effect for many years justified an expectation "that it would not be changed without bargaining and compliance with the status quo provisions of the RLA." *Ante*, at 506. This effectively restates Justice Harlan's argument in dissent that while not limited to the terms of *written* agreements, the status quo obligation is limited to a change in settled practice. See *Shore Line*, 396 U. S., at 159–160. The Court's emphasis on those dissenting remarks avails it nothing, because the instant controversy also arose out of a change in established procedure. By either a subjective or objective measure, therefore, it is reasonable to conclude that these employees' jobs are among the "working conditions" that must be preserved throughout the bargaining process.

Third, and most importantly, the Court points out that in contrast with these cases, the railroad in *Shore Line* had not proposed "to quit the railroad business, sell its assets, and cease to be a railroad employer at all," *ante*, at 507. The simple reply is that, in spite of claims of " 'managerial prerogative' " much like those advanced here,[8] the Court in *Tele-*

---

[8] Compare *Telegraphers*, 362 U. S., at 336 ("We cannot agree with the Court of Appeals that the union's effort to negotiate about the job security of its members 'represents an attempt to usurp legitimate managerial pre-

*graphers* held that the effects of a railroad's decision to terminate a part of its business constituted a proper subject of bargaining. There is no relevant difference between the partial abandonment in *Telegraphers* and the transfer of ownership proposed in these cases: in both, rail service would continue as before, but many employees would lose their jobs. Management's motive in *Telegraphers*, to cut costs by eliminating a large number of dispensable jobs, was of course perfectly reasonable. Thus when the Court held that the RLA required the railroad to bargain over the effects of the change, Justice Clark wrote:

> "Today the Court tells the railroad that it must bargain with the union or suffer a strike. The latter would be the death knell of the railroad. Hence, for all practical purposes, the Court is telling the railroad that it must secure the union's approval before severing the hundreds of surplus employees now carried on its payroll. Everyone knows what the answer of the union will be. It is like the suitor who, when seeking the hand of a young lady, was told by her to 'go to father.' But, as the parody goes, 'She knew that he knew that her father was dead; she knew that he knew what a life he had led; and she knew that he knew what she meant when she said "go to father."'" 362 U. S., at 343–344 (dissenting opinion).

Had the sale in these cases proceeded, the railroad would have operated the same service with a work force of 250 as compared to 750 employees. *Ante*, at 495. The economic benefits of that reduction are as obvious as those that would have been achieved by closing obsolete stations on the railroad system in *Telegraphers*. It is just as obvious, I believe, that

---

rogative in the exercise of business judgment with respect to the most economical and efficient conduct of its operations'"), with Brief for Petitioner 25 ("A decision to go out of business is the quintessential managerial prerogative").

the RLA again commands bargaining. As Judge Becker noted in his opinion for the Court of Appeals:

> "We are fully aware of the unfortunate ramifications and irony of our decision. A bargaining order, and a status quo injunction, designed to foster conciliation, promote labor peace, and ultimately keep the rails running, may ultimately have the perverse effect of destroying the only chance P & LE has for survival and perhaps even the very jobs that the unions are now trying to protect. Although we are not happy with this result, we feel constrained to reach it, because the Supreme Court has appropriately admonished the judiciary not to apply its own brand of 'common sense' in the face of a contrary statutory mandate." 845 F. 2d 420, 446 (CA3 1988) (citing *TVA* v. *Hill*, 437 U. S. 153, 193–195 (1978)).

To evade the natural result of adherence to *Shore Line* and *Telegraphers*, the Court relies on two later opinions declaring that "an employer has the absolute right to terminate his entire business for any reason he pleases," *Textile Workers* v. *Darlington Mfg. Co.*, 380 U. S. 263, 268 (1965), and that the consequences of a partial closure are not a mandatory subject of bargaining, *First National Maintenance Corp.* v. *NLRB*, 452 U. S. 666 (1981). See *ante*, at 507–509, and n. 17. But those opinions interpreted the strictures that the National Labor Relations Act places on an unregulated industry. As we noted in *First National Maintenance Corp.*, that is a situation far different from the RLA's governance of a regulated industry.[9]

---

[9] We stressed that the decision in *Telegraphers* "rested on the particular aims of the Railway Labor Act and national transportation policy. See 362 U. S., at 336–338. The mandatory scope of bargaining under the Railway Labor Act . . . [is] not coextensive with the National Labor Relations Act and the [National Labor Relations] Board's jurisdiction over unfair labor practices. See *Chicago & N. W. R. Co.* v. *Transportation Union*, 402 U. S. 570, 579, n. 11 (1971) ('parallels between the duty to bargain in good faith and the duty to exert every reasonable

At issue today is the RLA's regulation of a railroad's freedom to leave the market. Perhaps the RLA's restrictions on that freedom, as interpreted in *Telegraphers* and *Shore Line*, do not best serve national transportation interests. But since Congress has not overruled those interpretations, it is, as Judge Becker observed, inappropriate for judges to undertake to fill the perceived policy void.

For these reasons, I would affirm the judgment of the Court of Appeals in No. 87–1888.

---

effort, like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes')." *First National Maintenance Corp.* v. *NLRB*, 452 U. S. 666, 686–687, n. 23 (1981).