RICHMOND, FREDERICKSBURG
& POTOMAC RAILROAD
COMPANY, Plaintiff,

v.

TRANSPORTATION
COMMUNICATIONS INTERNATIONAL
UNION, Defendant.

Civ. No. 90–1649–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 1, 1991.

**1110**

Brooks, Timothy Paul Shea and Gardner, Washington, D.C., for plaintiff.

Dzialo, Michael Gerard, Guerrier, Edmond and James, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I. *Introduction*

This case grows out of a dispute between a carrier and a union over whether the carrier may unilaterally offer a lump-sum severance payment to senior employees represented by the union. This dispute was submitted to an arbitrator, who ruled in the union's favor. Presented here is the question whether the arbitrator has the power to preclude such unilateral offers based solely on his reading of the Railway Labor Act[1] ("RLA") and given that such offers are not prohibited by the parties' labor agreement.

---

1. 45 U.S.C. § 151 *et seq.*

2. In 1980, RF & P and TCU altered the Agreement by extending the protections provided therein to clerical employees who were in active

More specifically, Richmond, Fredericksburg & Potomac Railroad Company ("RF & P") posted an offer of a lump-sum severance allowance for up to fifteen senior clerical employees in April 1990. The clerical union, Transportation Communications International Union ("TCU"), opposed the offer, claiming that RF & P must bargain with TCU and not directly with the individual employees. The parties agreed to submit the issue to arbitration. The arbitrator found the parties' labor agreement silent on whether RF & P could offer lump-sum severance allowances unilaterally and therefore that RF & P acted without contractual authority in offering the voluntary separation payments absent TCU's approval. RF & P petitioned the arbitrator for reconsideration, claiming that such lump-sum severance offers were valid where, as here, they violate no provision of the labor agreement. RF & P also argued that the arbitrator had exceeded the proper scope of his jurisdiction by reframing the issue submitted by the parties. The arbitrator denied RF & P's petition. RF & P then filed this complaint, seeking to set the award aside. The matter is now before this Court on RF & P's motion for summary judgment and TCU's cross-motion for summary judgment. While this motion was pending, the parties entered into a one year buyout agreement ("Buyout Agreement") for some protected employees, which TCU suggests moots the issue before the Court.

### II. *Background*

In 1965, during a period of prosperity in the railroad industry, RF & P entered into a job protection agreement, the February 7, 1965 Job Stabilization Agreement ("Agreement"), with the clerks' union to avoid the threat of a strike and to protect certain clerical jobs threatened by new technologies. The Agreement provides that "protected employees," those employees who were in active service for the railroad in 1964, must be paid—whether they work or not—until they are removed from service by "natural attrition."[2] Among the ways

service of the Carrier on or before December 31, 1976, or who thereafter attained a three year employment relationship in the clerical class or craft.

in which natural attrition might occur is an employee's resignation. In that event coverage under the Agreement ceases.

Railroads continued to prosper through the 1960s and 1970s. During this period, the Potomac Yard, a railroad switching yard in Alexandria Virginia owned and operated by RF & P, was quite busy. This picture changed in the 1980s. In that decade, technological advances, coupled with a decline in heavy industries in the northeast and midwest, brought harder times for railroads and a decline in switching activity at the Potomac Yard. This, in turn, led to a marked reduction in the amount of work available there for certain clerical workers. To accommodate this situation, RF & P assigned senior employees to fill the available clerical positions at Potomac Yard while seventeen more junior employees, all of whom are "protected" under the Agreement, are paid by RF & P to sit idle at home.

Responding to these circumstances, RF & P posted an offer of a lump-sum severance allowance on April 27, 1990, for up to fifteen senior clerical employees covered by the Agreement. In return for the lump-sum severance payments, the employees must voluntarily resign from service with RF & P and thereby voluntarily give up their protected status. TCU opposed this offer on the grounds that it was too low and that RF & P must bargain with TCU and not deal directly with the employees. The parties agreed to submit the issue to a Public Law Board for arbitration. The Board consisted of representatives from RF & P and TCU, and a third neutral member (the "arbitrator"). The parties also confirmed in a letter dated May 16, 1990, that the agreed upon issue for arbitration would be "whether the RF & P [could] unilaterally separate employees without an agreement with TCU...." Pending the arbitration decision, the parties agreed that no individual voluntary separation arrangements would be concluded at Potomac Yard.

During the arbitration proceeding, RF & P addressed the issue of unilateral separation offers by arguing that the offer did not violate the terms of the parties' Agreement. RF & P also claimed that, in any event, its offer was supported by both (i) the Agreement, which expressly contemplates that employees may resign and give up their protected status, and (ii) the railroad's established practice of making similar offers to individual workers without TCU's participation or objection. For its part, TCU addressed the issue by arguing that RF & P did not have express or implied contractual authority to make lump-sum severance offers directly to protected employees. TCU also argued that no established past practice existed, absent TCU's participation.

In his proposed award of August 2, 1990, the arbitrator rejected RF & P's argument that past practice rising to the level of an implied agreement permitted RF & P to engage in direct dealing with the protected employees. The arbitrator also found no support for the lump-sum severance offers in the Agreement. In fact, he found the Agreement wholly "silent" on the issue. Given the Agreement's silence, the arbitrator concluded that RF & P had no contractual authority to offer the voluntary lump-sum separation allowances to clerks at Potomac Yard without TCU's approval. The arbitrator noted that he had carefully examined the Agreement between the parties before arriving at his award, yet the award's "Discussion" section included no analysis of the Agreement. Instead, the arbitrator dismissed arbitration precedent on the issue of "silent" labor agreements, and discussed his interpretation of "federal court directives concerning [RF & P's] obligations" under the RLA. In requiring RF & P to show express or implied contractual authority for its actions, the arbitrator placed special emphasis on judicial opinions involving the RLA that, in his view, had addressed the question of the destructive impact of employer direct dealing on collective bargaining.

RF & P sought reconsideration of the proposed arbitration award on or about August 23, 1990. Specifically, RF & P argued that the arbitrator exceeded the proper scope of his arbitral jurisdiction by requiring RF & P to show affirmative contractual

authority. RF & P also pointed out that the arbitrator, in reaching his decision, ignored the consistent line of prior arbitration decisions holding such offers valid if they did not violate the labor agreement between the parties. In RF & P's view, the arbitrator exceeded his jurisdiction because he arrived at his decision by relying solely on his interpretation of the RLA. Finally, RF & P claimed that part of the authority on which the arbitrator had relied for his decision—two federal district court cases— had been completely undermined by later circuit and Supreme Court decisions.

On or about October 31, 1990, the arbitrator denied RF & P's petition for reconsideration. In his supplemental opinion, the arbitrator reaffirmed his formulation of the question presented and his proposed award. He specified that under his interpretation of the RLA, the burden of proof had been on RF & P to "establish a contractual basis for its proposed action." The arbitrator concluded that the voluntary lump-sum separation offer was a "non-contractual action" seeking to avoid "specific contractual obligations" of the Agreement. But significantly, the arbitrator did not find that the lump-sum severance offers violated the Agreement in any way.

RF & P filed this action on December 7, 1990, seeking to set aside the arbitration award. It agreed to refrain from offering voluntary lump-sum separation allowances to its clerical employees at Potomac Yard pending disposition of this matter. While the parties' cross-summary judgment motions were pending, they entered into a Buyout Agreement which, by its terms, is effective from October 1, 1991 to October 1, 1992. The Buyout Agreement allows RF & P to extend voluntary lump-sum separation offers to senior employees up to the number of protected employees who are furloughed on the date of the initial offer. If RF & P chooses to make voluntary lump-sum severance offers to protected employees beyond those furloughed, the Buyout Agreement specifies that RF & P must confer with TCU as to the number of employees to whom such offers may be extended. As an express condition to the Buyout Agreement, RF & P and TCU stated that "[e]ither party may propose to revise, retain or terminate th[e] [A]greement upon a thirty day written notice served prior to October 1, 1992." In addition, RF & P and TCU acknowledged, in writing, that the Buyout Agreement was without prejudice to their respective positions regarding unilateral lump-sum separation offers and the parties reserved their rights with respect to the rights arbitrated in this case.

## III. Analysis

### A. Mootness

The threshold issue is mootness. Well-settled principles determine whether a matter is moot. In essence, a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980) (quoting *Powell v. McCormack,* 395 U.S. 486, 495–96, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969)). A case is no longer live if, for example, a challenged order has no "continue[d] impact on the parties," *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 569, 104 S.Ct. 2576, 2583, 81 L.Ed.2d 483 (1984), or if no issues in the order remain unresolved. *See Powell v. McCormack,* 395 U.S. at 495–96, 89 S.Ct. at 1950. Alternatively, a case is moot if the "party invoking federal court jurisdiction" no longer has " 'a personal stake in the outcome of the controversy.' " *Geraghty,* 445 U.S. at 397, 100 S.Ct. at 1209 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). An exception to the mootness doctrine exists where it appears that all issues in a case have been resolved, but the issues are "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

Applied here, these settled principles point persuasively away from mootness. This case remains alive because the challenged order, the arbitration award, will continue to have an impact on the parties notwithstanding the Buyout Agree-

ment. This is so because the arbitration award, by its terms, purports to cover all TCU-represented employees working for RF & P, whereas the Buyout Agreement applies only to RF & P's clerical employees up to the number of protected employees who are furloughed on the date of RF & P's initial separation offer. Thus, the employee coverage of the arbitration award and that of the Buyout Agreement are not congruent. Assuming the Buyout Agreement remains in effect[3], situations may arise in which the Buyout Agreement would not apply, yet the arbitration award would. Specifically, if RF & P unilaterally offered lump-sum severance payments to TCU-represented employees beyond the number of protected, furloughed employees (*i.e.*, those employees not covered by the Buyout Agreement), the offers would arguably run counter to the arbitration award. Given this, the Buyout Agreement does not render the case moot because the arbitration award "continue[s] to have an impact on the parties such that the case remains alive." *Stotts,* 467 U.S. at 569, 104 S.Ct. at 2583. Moreover, RF & P, the party invoking federal court jurisdiction, continues to have a personal stake in the outcome of this controversy. If the arbitration award is upheld, RF & P must bargain with TCU before it offers lump-sum severance payments to those protected employees not covered by the Buyout Agreement. On the other hand, if the arbitration award is invalidated, RF & P need not bargain with TCU before unilaterally offering such lump-sum severance allowances. In sum, this case remains alive and the parties retain a legally cognizable interest in the outcome. It is not moot.[4]

**B.** *Review of the Arbitration Award*

■ Federal district courts are empowered to review the decisions of labor arbitrators under § 301 of the Labor Management Relations Act. 29 U.S.C. § 185(c) (1978).[5] Specifically, § 153 First (q) of the RLA states that a district court has jurisdiction to set aside an arbitration award "in whole or in part" or to remand to the [board], "for failure of the [board] to comply with the requirements of [the RLA, or] for failure of the order to conform, or confine itself, to matters within the scope of the [board's] jurisdiction[.]" 45 U.S.C. § 153 First (q) (1986).[6] These bases of review apply to awards of arbitration boards established under 45 U.S.C. § 153 Second, as was the board in this case. *See Employees Protective Ass'n v. Norfolk & W. Ry. Co.,* 511 F.2d 1040, 1045 (4th Cir. 1975) (courts have generally held that awards of public law boards are subject to limited judicial review). Importantly, however, a federal district court's review of an arbitration award is limited. A court should not overrule an arbitrator's decision concerning construction of a labor agreement simply because its interpretation of the agreement differs from that of the arbitrator. *United States Steelworkers of Am. v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). Nonetheless, if an arbitrator's award does not "draw its essence" from the collective bargaining agreement, a court has "no choice but to refuse enforcement of the award." *Clinchfield Coal Co. v. District 28, United Mine Workers of Am.,* 720 F.2d 1365, 1368 (4th Cir.1983) (quoting *Enterprise Wheel,* 363 U.S. at 593, 80 S.Ct. at 1358); *Brotherhood of R.R. Trainmen v. Central of Ga.*

---

**3.** The Buyout Agreement gives the parties the right to propose termination of the Agreement through a thirty day written notice served prior to October 1, 1992.

**4.** Given that this case is not moot under the two part mootness doctrine, the Court need not apply the exception for issues that are capable of repetition, yet evading review.

**5.** Section 185(c) states:
For the purposes of actions and proceedings by or against labor organizations in the dis-

trict courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.
29 U.S.C. § 185(c).

**6.** The other basis for review under § 153 First (q)—"fraud or corruption"—is not at issue in this case. 45 U.S.C. § 153 First (q) (1986).

*Ry. Co.*, 415 F.2d 403, 412 (5th Cir.1969), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970) (If the award does not draw its essence from the agreement, it is a violation of the arbitrator's jurisdiction under the RLA as well as the NLRA). Here, the arbitrator found the Agreement between RF & P and TCU silent on the issue of unilateral lump-sum separation offers. Given the Agreement's silence, the arbitrator looked to federal court cases involving the RLA. Based solely on his interpretation of these cases, the arbitrator decided that the RLA required RF & P to show express or implied contractual authority for its actions. The question presented then, is whether in so doing, the arbitrator exceeded his arbitral power.[7]

■ The starting point in this analysis is to examine the scope of the parties' submission to determine whether the arbitrator, in reaching his decision, went beyond the bounds of the submission. As the Fourth Circuit stated in *Bowater Carolina Co. v. Rock Hill Local Union 1924*, "[t]he parties, not the arbitrator, must define the issues. The parties' submission is 'the source and limit' of the arbitrator's power." 871 F.2d 23, 25 (4th Cir.1989) (quoting *International Chem. Workers Union, Local No. 566 v. Mobay Chem. Corp.*, 755 F.2d 1107 (4th Cir.1985)). Thus, courts are not empowered to restrict the scope of authority that parties confer upon an arbitrator. Unless it is apparent that an arbitrator went beyond the parties' submission, courts should enforce the arbitration award. *See International Chem. Workers Union*, 755 F.2d at 1112.

The issue submitted for arbitration by RF & P and TCU was "whether the RF & P [could] unilaterally separate employees without an agreement with TCU...." Thus, the parties stated the issue broadly. They did not specify whether the arbitrator

was to determine if the unilateral lump-sum separation offers violated, or were authorized, by the Agreement. It does not appear, therefore, that the arbitrator exceeded the scope of the parties' submission when he framed the issue as requiring RF & P to show express or implied contractual authority for its unilateral lump-sum separation offers.

■ But this is not the end of the analysis. For an arbitration award to be upheld, the award must be based chiefly on the collective bargaining agreement. And the collective bargaining agreement consists of more than just the written agreement itself. An integral part of the collective bargaining agreement that must be taken into account by an arbitrator is "any existing common law of the particular industry." *See Clinchfield Coal Co.*, 720 F.2d at 1368 (quoting *Norfolk Shipbuilding and Drydock Corp. v. Local No. 684*, 671 F.2d 797, 799–800 (4th Cir.1982)). The common law of the industry in this case consists of railway arbitration awards, which for 40 years have consistently held that "[u]nless there exists a contractual prohibition precluding [a] Carrier from taking the action disputed, we have no authority under the Railway Labor Act to find for the [Union]." Award No. 21858 (NRAB 3rd Div.1978). *See e.g.*, Case No. 4 (Pub.L.Bd. No. 4457 1989) (arbitrator upheld voluntary separation offer because the railroad's offer did not violate any agreement with the employees); Award No. 4733 (NRAB 2d Div.1965) (arbitrator stated the issue as whether the voluntary separation offers violated the collective bargaining agreement); Award No. 1579 (NRAB 2d Div. 1952) (arbitration award in favor of the railroad because the arbitrator found nothing in the parties' agreement to prohibit the making of the contract between the employee and the railroad).[8] This consist-

---

7. Although TCU opposed RF & P's unilateral lump-sum severance offers and the matter proceeded to arbitration, many carriers are not met with such union opposition. For example, when the Soo Line offered individual employees the opportunity to resign in return for a lump-sum allowance in 1985, twelve out of thirteen unions did not oppose the plan. *See IAM v. Soo Line R.R.*, 850 F.2d 368, 373 (8th Cir.1988) (en

banc), *cert. denied*, 489 U.S. 1010, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989).

8. *See also* Award No. 20811 (NRAB 3rd Div. 1975) (arbitration award in favor of the railroad because the railroad's action did not violate the parties' labor agreement); Award No. 3232 (NRAB 4th Div.1975) (same); Award No. 66 (Pub.L.Bd. No. 596 1975) (same); Award No.

ent line of authority constitutes the common law of the industry. Given the Agreement's silence on the issue of voluntary lump-sum severance offers, the arbitrator was bound to give effect to this common law precedent. By failing to do so, he went beyond the bounds of his arbitral authority when he required RF & P to show express or implied contractual authority for its unilateral lump-sum separation offers based solely on his interpretation of federal court RLA decisions. Had the arbitrator considered the common law precedent, as he is directed to do by the Fourth Circuit's *Clinchfield* decision, he would have discovered that the common law of the industry instructed him to consider the issue submitted to him by the parties in terms of whether the severance offers in issue "violated" the parties' Agreement, not whether the Agreement "authorized" such offers. And no violation can be said to have occurred where, as here, the Agreement, as the arbitrator found, was silent on such lump-sum severance offers.

By choosing to ignore RLA arbitration precedent and relying instead solely on federal court decisions dealing with the RLA, the arbitrator ran afoul of settled Supreme Court precedent that "[i]f an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement, the arbitrator has 'exceeded the scope of the [parties'] submission,' and the award will not be enforced." *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974) (quoting *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at

1361). Precisely this occurred here: the arbitrator chose to rely on his view of the requirements of the RLA, rather than on an interpretation of the Agreement, which includes the industry's common law, as reflected in railway arbitration awards. In so doing, the arbitrator exceeded his arbitral authority.

In reaching the conclusion that RF & P must show affirmative authority for its unilateral lump-sum severance offers, the arbitrator misconstrued three RLA cases: *Order of Railway Telegraphers v. Railway Express Agency*, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944); *BRAC v. Chesapeake & O. Ry. Co.*, 115 LRRM (BNA) 3635, 1983 WL 1754 (N.D.Ohio 1983); and *Southern P. Transp. Co. v. BRAC*, 636 F.Supp. 57 (D.Utah 1986).

In *Order of Railway Telegraphers*, the Supreme Court held that rules regarding individual contracts under the NLRA developed by the Court in *J.I. Case Co. v. NLRB*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), were also applicable under the RLA. The Court stated that under the RLA, effective collective bargaining includes the right of unions to be consulted and to bargain about rates of pay, rules, and working conditions. *Order of Railway Telegraphers*, 321 U.S. at 347, 64 S.Ct. at 585. Moreover, the Court decided that a carrier may not modify a collective bargaining agreement through agreements with individual employees. *Id.* These two Supreme Court decisions can be distinguished from the case at bar. Here, RF & P did not attempt to modify any of the terms of its Agreement with TCU through its unilateral lump-sum separation offers. Rather, RF & P tried to reach an agreement with its employees, independent of the Union, on a subject not covered by the parties' collec-

20525 (NRAB 3rd Div.1974) (same); Award No. 19752 (NRAB 3rd Div.1973) (same); Award No. 19938 (NRAB 3rd Div.1973) (same); Award No. 34 (Pub.Law Bd. No. 706 1972) (same); Award No. 28 (Special Bd. of Adj. No. 506 1963) (same); Award No. 12907 (NRAB 1st Div.1949) (same); Award No. 9875 (NRAB 2d Div.1984) (individual employee is entitled to withdraw claim for back pay without union participation); Award No. 24869 (NRAB 3rd Div.1984) (upholding separation and release of claims against

challenge that union had not been consulted); Award No. 1 (Sec. 11 Arb.Comm.1983) (individual release upheld); Award No. 6 (Pub.L.Bd. No. 2603 1980) (individual severance agreement upheld over later claim for reinstatement and back pay); Award No. 1881 (Spec.Bd. of Adj. No. 235 1974) (individual resignation upheld over claim of coercion); Award No. 5162 (NRAB 2d Div.1967) (individual release upheld against claim for reinstatement and back pay).

tive bargaining agreement.[9]

The arbitrator also relied on *Chesapeake & O. Ry. Co.*, 115 LRRM at 3635, and *Southern P. Transp. Co.*, 636 F.Supp. at 57. While these cases discuss the question of whether a railroad must show positive authority for a voluntary separation offer under the RLA, both cases were premised on an understanding of the RLA that has been undermined by more recent Supreme Court precedent. Both cases dealt with the union's right to seek an injunction to preserve the status quo and prevent the carrier from granting lump-sum severance payments, pending the carrier's compliance with 45 U.S.C. § 156.[10] In both cases, the courts applied the status quo requirement in accordance with the Supreme Court's pronouncement in *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969), that the status quo to be maintained during a § 156 dispute includes actual working conditions objectively in existence. *Chesapeake & O. Ry. Co.*, 115 LRRM at 3635; *Southern P. Transp. Co.*, 636 F.Supp. at 57. Significantly, however, the Supreme Court recently limited the *Shore Line* status quo requirement under § 156. In *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Ass'n*, 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), the Court held that under § 156, the only status quo that had to be maintained consisted of obligations arising under existing written agreements and implied agreements from an "unquestioned practice for many years." *Id.* 109 S.Ct. at

2594. The arbitrator did not mention this development in his award. RF & P contends that even if TCU had filed a § 156 notice, *Pittsburgh & Lake Erie* would not require the status quo to be maintained because no express agreement existed between the parties to invalidate RF & P's unilateral separation offers and RF & P had no longstanding practice against such offers that could have become an implied term of the parties' collective bargaining agreement.

In any event, *Chesapeake & O. Ry. Co.*, 115 LRRM at 3635, and *Southern P. Transp. Co.*, 636 F.Supp. at 57 are inapposite here. They deal with § 156, which is not at issue in this case. RF & P agreed not to complete any of the separations pending a resolution of this dispute. Thus, TCU had no need to file a § 156 notice, nor to seek an injunction to preserve the status quo. Moreover, § 156 only applies where, as is not true here, there is "an intended change in agreements." *See Pittsburgh & Lake Erie*, 109 S.Ct. at 2592–93 (Court found that the carrier need not provide the union with a § 156 notice because the carrier's actions did not violate or change any of the provisions of the labor agreement between the parties). RF & P's lump-sum separation offers are not a change in its Agreement with TCU because the parties' Agreement does not cover the issue of unilateral lump-sum separation offers. In sum, because the arbitrator based his award solely on an arguably mistaken reading of federal court RLA directives, rather than on the parties' collective bargaining agreement as supplemented by the com-

---

**9.** TCU argues that the unilateral lump-sum separation offers will diminish RF & P's obligations under the collective bargaining agreement. These effects, TCU contends, are sufficient to invalidate the offers. *J.I. Case*, 321 U.S. at 339, 64 S.Ct. at 581 (holding that an employer cannot enter into an individual contract if it would result in a diminution of the employer's obligations in matters covered by the collective bargaining agreement). This is unpersuasive. Unilateral lump-sum severance offers leave intact and undiminished RF & P's obligations under the Agreement. Any furloughed junior clerical employees will continue to receive payments from RF & P. In addition, junior clerical employees replacing separated senior employees may receive more money from RF & P than

anticipated under the Agreement because these junior employees will now be eligible for overtime. Furthermore, any senior employees who do not accept the separation offer will continue being paid by RF & P for their work. Finally, those senior employees accepting the separation offer will be paid their salary and benefits by RF & P; the compensation will simply be one lump-sum payment.

**10.** 45 U.S.C. § 156 states in pertinent part: "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended *change in agreements* affecting rates of pay, rules, or working conditions...." (Emphasis added).

mon law of the industry, the award did not draw its essence from the Agreement. Under these circumstances, this Court has "no choice but to refuse enforcement of the award." *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. at 1361.

An appropriate Order will be entered.