BERKSHIRE SCENIC RAILWAY
MUSEUM, INC., Petitioner,

v.

INTERSTATE COMMERCE
COMMISSION,
Respondent.

No. 94–1701.

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1995.

Decided March 27, 1995.

James E. Howard with whom M. Katherine Willard and Kirkpatrick & Lockhart were on brief, for appellant.

Evelyn G. Kitay, Attorney, Office of General Counsel, with whom Laurence H. Schecker, Attorney, Henri F. Rush, General Counsel, and John J. McCarthy, Jr., Associate General Counsel, Interstate Commerce Com'n, and Jeffrey P. Kehne, Attorney, Environment & Natural Resources Div., Dept. of Justice, were on brief, for Interstate Commerce Com'n.

Edward J. Rodriguez, for intervenors Housatonic Track Co., Inc., and Housatonic R.R., Inc.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

The Housatonic Track Company, Inc., and Housatonic Railroad, Inc. (jointly, "Housatonic"), sought an exemption from the Interstate Commerce Act ("ICA") to permit their acquisition and operation of a rail line in Massachusetts and Connecticut, known as the Canaan Secondary Branch, then owned by the Boston and Maine Corporation ("B & M"). The Interstate Commerce Commission ("ICC") granted the exemption. Berkshire Scenic Railway Museum, Inc. ("Berkshire"), which owns and operates a museum in a historic railroad station on the Canaan Secondary Branch in Lenox, Massachusetts ("Lenox station"), petitioned the ICC to declare the exemption void *ab initio,* contending that it was based on false and misleading information. The ICC denied Berkshire's petition and Berkshire now seeks our review of the ICC's decision. We affirm.

## I.

The background to this dispute involves the history of Berkshire, details of the Housatonic–B & M transaction, and intricacies of

ICC acquisition-approval regulations. A brief discussion follows.

Pursuant to a series of annual agreements with B & M, Berkshire operated a scenic railway line on a portion of B & M-owned track between the Massachusetts–Connecticut border and Pittsfield, Massachusetts. Berkshire, a non-profit organization, used the revenue from the scenic railway to fund the renovation of the Lenox station.[1] The scenic railway operated for six years, from 1984 through 1989.[2] From 1984–1988, Berkshire's trains operated from Lee, Massachusetts to Great Barrington, Massachusetts. In 1989, Berkshire used the Lenox station as the locus for the scenic railway.

Meanwhile, B & M allowed the track to deteriorate. Sensing opportunity, Housatonic sought to extend their already existing freight-line operations along the B & M-owned track in Massachusetts. Negotiations between B & M and Housatonic led to agreement and, in November 1990, pursuant to 49 U.S.C. § 10505, Housatonic filed a petition seeking an exemption from the ICC's certification requirements for the acquisition and operation of the rail line.[3]

As part of the exemption-approval process, Housatonic advised the Massachusetts State Historic Preservation Officer ("SHPO") that they intended to acquire and operate the line as a freight operation. Housatonic requested the SHPO to advise the ICC of any objections to the transaction. In their letter to the SHPO, Housatonic stated that "the property to be acquired is now used for freight railroad service and will continue to be used for freight railroad service. No change of use is contemplated. No buildings whatsoever are located on the property to be acquired." In fact, a small portion of the Lenox station encroaches on the railroad right-of-way. At the time of their letter to the SHPO, however, Housatonic did not know of the encroachment.

On December 17, 1990, the SHPO wrote a no-objection letter to the ICC. The SHPO noted that there were historic structures or multiple historic districts and properties either listed or eligible for listing on the National Register adjacent to or within the proposed route. She nonetheless concluded that "this project will have no effect on the significant architectural and historical characteristics of these [historic properties and districts]." The SHPO did not specifically mention the Lenox station. Berkshire did not comment to the ICC on Housatonic's exemption petition.

In an order dated December 21, 1990, the ICC dismissed Housatonic's exemption petition, instead determining that they qualified for a so-called class exemption.[4] Thus, the ICC authorized the Housatonic acquisition.[5] The ICC decision did not explicitly address historic preservation.

1. Constructed in 1902, the Lenox station was added to the National Register of Historic Places ("National Register") in 1989.

2. The record suggests that by 1989, the B & M–Berkshire relationship had deteriorated significantly. B & M chose not to renew its agreement with Berkshire.

3. Noncarriers seeking to acquire a rail line must secure regulatory approval from the ICC. Housatonic Track Company, Inc., was a noncarrier for purposes of the regulations. Pursuant to 49 U.S.C. § 10901, the ICC may issue a certificate of public convenience and necessity. Alternatively, 49 U.S.C. § 10505 authorizes exemptions from § 10901's formal certification process if the exemption is needed to advance "rail transportation policy." Under this authority, the ICC has exempted so-called "acquisition and operation" applications, such as Housatonic's, from the full-blown certification process. *See generally Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*, 491 U.S. 490, 499–501, 109 S.Ct.

2584, 2591–92, 105 L.Ed.2d 415 (1989) (describing regulatory regime).

4. Under § 10505, the ICC has exempted so-called "acquisition and operation" applications, as a class, from the full-blown certification process. *See Pittsburgh & Lake Erie R.R.*, 491 U.S. at 499–500, 109 S.Ct. at 2591.

5. Regulations appearing at 49 C.F.R. § 1150.32 set forth the procedure by which the ICC grants § 10505 acquisition and operation exemptions. First, an applicant files a verified notice of exemption. The exemption then becomes effective seven days after filing and will be published in the Federal Register within 30 days after filing. An exemption will be void *ab initio* if the applicant's notice contains false or misleading information. 49 C.F.R. § 1150.32(a)–(c). Any person opposing the transaction must file a petition to revoke. 49 U.S.C. § 10505(d).

Prior to the acquisition, Housatonic had assured Berkshire that Berkshire could operate the scenic railway on the tracks. Subsequent to the acquisition, however, the parties were unable to reach an agreement. Berkshire claims that without revenue from the scenic railway, it cannot continue to renovate the Lenox station or educate the public about railroading, thus frustrating its mission. Following the failure in negotiations, Berkshire petitioned the ICC to revoke Housatonic's exemption, arguing that the ICC had acted on the basis of false and misleading information.[6] Berkshire also asserted that the ICC had failed to perform adequate historic preservation and environmental assessment analyses. Finally, it argued that the ICC should have conditioned any exemption on the requirement that Housatonic allow Berkshire to operate the scenic railway. After an extended review, the ICC denied Berkshire's petition. Berkshire then sought review by this court.

## II.

In this proceeding, Berkshire makes two principal arguments: (1) Housatonic's allegedly false and misleading statements to the SHPO should render their exemption void *ab initio;* and (2) the ICC's failure to conduct adequate historic preservation and environmental reviews requires it to conduct new reviews. We find no merit in either contention. After reciting the standard of review, we discuss each argument in turn.

### A. *Standard of Review*

■ We accord broad deference to ICC decisions to exempt transactions from the ICA. We will uphold the ICC decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also CMC Real Estate Corp. v. ICC,* 807 F.2d 1025, 1030 (D.C.Cir.1986); *Simmons v. ICC,* 697 F.2d 326, 342 (D.C.Cir.1982). Under this standard, our review of the ICC's action is to determine whether a "rational basis" for the

agency's decision lies in the facts on the record. *See, e.g., Simmons,* 697 F.2d at 342; *National Tour Brokers Ass'n v. ICC,* 671 F.2d 528, 532 (D.C.Cir.1982).

### B. *The ICC's Refusal to Revoke the Exemption*

Berkshire argues that the ICC acted arbitrarily and capriciously by failing to follow its regulations which, it says, should have rendered the exemption void *ab initio.* We do not agree.

■ As noted above, *see supra* note 5, under applicable ICC regulations, an exemption is void *ab initio* if the notice of exemption contains false or misleading information. The ICC has interpreted the regulation to require that such information concern a "material" part of the transaction. *Mendocino Coast Ry., Inc.,* 1988 WL 224486, at *3 (I.C.C. July 14, 1988). A statement is material if, for example, the transaction would not have otherwise qualified for an exemption. *Sagamore Nat'l Corp.,* 1994 WL 487580, at *2 (I.C.C. Sept. 9, 1994).

Berkshire contends that Housatonic's representations to the SHPO contained three false or misleading statements.[7] The substance of the alleged misrepresentations, derived from Housatonic's letter quoted above, are: (1) no buildings are located on the property to be acquired; (2) no change in use of the line is contemplated; and (3) the property is now and will continue to be used for freight service. Berkshire argues that these statements misrepresented the facts because: (1) in light of its encroachment onto the railway right-of-way, the Lenox station is, in fact, located on the acquired property; and (2) Housatonic did not disclose that they would subsequently refuse to allow Berkshire to operate the scenic railway.

■ In lieu of the ICC's materiality requirement, Berkshire advocates a literal reading of the regulation: *any* false or misleading information should lead to an exemption being void *ab initio.* However, we ac-

---

6. *See supra* note 5.

7. For purposes of this appeal, we assume but do not decide, that "false or misleading information"

tion" provided to the SHPO rather than contained in the notice of exemption itself is sufficient to render the exemption void *ab initio.*

cord substantial deference to an agency's interpretation of its own regulations, *see, e.g., Reich v. Simpson, Gumpertz & Heger, Inc.,* 3 F.3d 1, 2 (1st Cir.1993), and Berkshire has not persuaded us that, on these facts, that deference should be displaced. Accordingly, we see no reason to depart from the ICC's materiality requirement. Moreover, the ICC had ample basis to conclude that Housatonic's statements fall far short of the materiality requirement. With specific regard to the station-encroachment issue, the ICC found that Housatonic's representations were "immaterial misstatements." Had Housatonic represented the facts as they actually were, the transaction would have still qualified for a class exemption because historic preservation is simply not a material element of an "acquisition and operation" transaction. We also note that, as a practical matter, there is nothing about the acquisition itself that could have adversely affected the portion of the station on the right-of-way. Housatonic only proposed to operate railroad freight service, presumably a familiar activity on the tracks for most of the station's nearly ninety-year existence.

Berkshire's second contention—that Housatonic did not disclose that they would subsequently refuse to allow Berkshire to operate the scenic railway—rests on an even shakier footing. Not only is an agreement with Berkshire immaterial to a class exemption, but there is nothing in the ICA requiring Housatonic to allow Berkshire to use the tracks.

In short, because we find that Housatonic did not proffer "false or misleading information" within the meaning of that phrase as interpreted by the ICC, Housatonic's exemption is not void *ab initio* under 49 C.F.R. § 1150.32(c).

### C. The ICC's Historic Preservation and Environmental Reviews

Berkshire next argues that the ICC failed to conduct necessary historic preservation and environmental reviews. On review, we think the record provides a rational basis for the ICC's disposition.

Section 106 of the National Historic Preservation Act requires that a federal licensing agency shall, prior to the issuance of a license, "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. Applicable regulations, appearing at 36 C.F.R. § 800.9, set forth various "adverse effect" criteria to be considered by the federal entity.[8] Berkshire argues that Housatonic's acquisition is inconsistent with two such criteria: (1) "[i]solation of the property from or alteration of the character of the property's setting when that character contributes to the property's qualification for the National Register"; and (2) "[n]eglect of a property resulting in its deterioration or destruction." 36 C.F.R. § 800.9(b)(2) & § 800.9(b)(4). Berkshire reasons that, because it may no longer operate the scenic railway, the Lenox station is both "functionally isolated" (Berkshire's phrase) from its setting as well as deprived of revenues for the station's renovation, thus leading to its "deterioration." Accordingly, Berkshire argues, the petition should be remanded for a full review under Section 106. Berkshire also argues that any exemption should be conditioned on Housatonic's agreement to allow Berkshire to use the line.

■ Even in a charitable light, Berkshire's arguments strain credulity. As to Berkshire's first contention, there is no basis for a claim of isolation, functional or otherwise. At least three factors support this conclusion. First, as noted above, largely because of an apparent breakdown in the B & M–Berkshire relationship, the scenic railway had not operated for more than a year prior to the Housatonic acquisition. At most, therefore, the effect of the Housatonic transaction on the then-non-functioning scenic railway was to perpetuate the status quo. In other words, we find no basis to conclude that the Housatonic exemption led to the "isolation" Berkshire claims has resulted. Second, as the ICC notes, the SHPO issued a no-effect letter, in which neither Lenox station nor the

---

**8.** If an adverse effect exists, then the federal agency, in consultation with state officials, must "seek ways to avoid or reduce the effects" on historic properties. 36 C.F.R. § 800.5(e).

scenic railway were discussed. Third, we think that Berkshire's claim of "isolation . . . from the property's setting" is facially implausible in view of the fact that the historic property in question—a railway station—abuts and, indeed, actually encroaches upon an active railroad right-of-way.

Berkshire's "deterioration" argument is similarly unavailing. Whatever "deterioration" might have flowed from the cessation of the scenic railway was not an effect caused by Housatonic's exemption. As noted above, the scenic railway had ceased operating well before the Housatonic acquisition. Moreover, as the ICC notes, a substantial question exists as to whether it has jurisdiction to grant the relief Berkshire seeks—that is, conditioning any exemption on Berkshire's right to use the track. Because we find that the exemption gives rise to no adverse effects, we need not reach the jurisdictional issue.

Finally, Berkshire argues that the ICC should have required an environmental assessment of the effects of the acquisition. Again, we do not agree. Under then-existing regulations, the ICC did not require environmental assessments when there was "only a change in ownership or similar changes; such an issuance of securities or reorganization, but not involving a change in carrier operations." 49 C.F.R. § 1105.6(c)(2) (1990). The ICC reasoned that because no operational changes were involved in the Housatonic transaction, an assessment was not required. Berkshire, however, points to another then-existing regulation under which an assessment would normally have been required when the proposed transaction involved an "abandonment, acquisition, or operation of a line of railroad." 49 C.F.R. § 1105.6(b)(1) (1990). Berkshire argues that, by its terms, the former § 1105.6(c)(2) does not apply to an acquisition and operation of a line by a different entity and, in any event, the former § 1105.6(b)(1) directly applies. In its denial of Berkshire's petition, the ICC indicated that the former regulation applied. Before this court, the ICC concedes that either regulation could apply to the transaction. Inasmuch as the transaction did not involve a significant change in operations on the track,

we conclude the ICC did have a rational basis for not requiring an environmental assessment.

### III.

For the foregoing reasons, the decision of the Interstate Commerce Commission is

*Affirmed.*