UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



No. 95-1002

JAMES JOHNSON,

Plaintiff, Appellee,

v.

WATTS REGULATOR COMPANY, ET AL.,

Defendants, Appellants.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge] 



Before

Selya, Circuit Judge, 

Campbell, Senior Circuit Judge, 

and Cyr, Circuit Judge. 



Eleanor H. MacLellan, with whom Sean M. Dunne, Ross M. 
Weisman, and Sulloway & Hollis were on brief, for appellants. 
Christopher J. Seufert, with whom Seufert Professional 
Association was on brief, for appellee. 



August 23, 1995



SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. 

address, for the first time, a "safe harbor" regulation

promulgated by the Secretary of Labor (the Secretary) as a means

of exempting certain group insurance programs from the strictures

of the Employee Retirement Income Security Act of 1974 (ERISA),

29 U.S.C. 1001-1461. Determining, as we do, that the district

court appropriately applied the regulation, and discerning no

clear error in the court's factual findings on other issues in

the case, we affirm the judgment below.

I. BACKGROUND I. BACKGROUND

Plaintiff-appellee James Johnson worked as a forklift

operator at the Webster Valve division of defendant-appellant

Watts Regulator Co. (Watts) in Franklin, New Hampshire. While so

employed, plaintiff elected to participate in a group insurance

program made available to Watts' employees by defendant-appellant

CIGNA Employee Benefit Company d/b/a Life Insurance Company of

North America (CIGNA). Under the program plaintiff received

insurance protection against accidental death, dismemberment, and

permanent disability. He paid the premium through a payroll

deduction plan. Watts, in turn, remitted the premium payments to

CIGNA. 

On June 15, 1990, while a participant in the program,

plaintiff sustained a severe head injury in a motorcycle

accident. He remained disabled for the ensuing year, and, having

crossed the policy's temporal threshold, he applied for benefits

on July 17, 1991. CIGNA turned him down, claiming that he

2

retained the residual capacity to do some work. Plaintiff then

sued Watts and CIGNA in a New Hampshire state court. Postulating

the existence of an ERISA-related federal question, the

defendants removed the action to the district court.

Following an evidentiary hearing, the district court

ruled that ERISA did not pertain. See Johnson v. Watts Regulator 

Co., No. 92-508-JD, 1994 WL 258788 (D.N.H. May 3, 1994). 

Nevertheless, the court denied plaintiff's motion to remand,

noting diverse citizenship and the existence of a controversy in

the requisite amount. See 28 U.S.C. 1332(a). The parties 

subsequently tried the case to the bench. The judge heard the

evidence, perused the group policy, applied New Hampshire law,

found plaintiff to be totally and permanently disabled, and

awarded the maximum benefit, together with attorneys' fees and

costs. See Johnson v. Watts Regulator Co., No. 92-508-JD, 1994 

WL 587801 (D.N.H. Oct. 26, 1994). This appeal ensued.

II. THE ERISA ISSUE II. THE ERISA ISSUE

The curtain-raiser question in this case involves

whether the program under which Johnson sought benefits is

subject to Title I of ERISA. Confronting this issue requires

that we interpret and apply the Secretary's safe harbor

regulation, 29 C.F.R. 2510.3-1(j) (1994). We divide this part

of our analysis into four segments. First, we explain why the

curtain-raiser question matters. Second, we limn the applicable

standard of review. Third, we discuss the regulation itself and

how it fits into the statutory and regulatory scheme. Fourth, we

3

scrutinize the record and test the district court's conclusion

that the program is within the safe harbor.

A. The ERISA Difference. A. The ERISA Difference. 

From the earliest stages of the litigation, a

controversy has raged over the relationship, if any, between

ERISA and the group insurance program underwritten by CIGNA.

This controversy stems from perceived self-interest: if ERISA

applies, preemption is triggered, see 29 U.S.C. 1144(a), and, 

in many situations, the substitution of ERISA principles (whether

derived from the statute itself or from federal common law) for

state-law principles can make a pronounced difference. For

example, ERISA preemption may cause potential state-law remedies

to vanish, see, e.g., Carlo v. Reed Rolled Thread Die Co., 49 

F.3d 790, 794 (1st Cir. 1995); McCoy v. Massachusetts Inst. of 

Technology, 950 F.2d 13, 18 (1st Cir. 1991), cert. denied, 504 

U.S. 910 (1992), or may change the standard of review, see, e.g., 

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1988), 

or may affect the admissibility of evidence, see, e.g., Taft v. 

Equitable Life Ins. Co., 9 F.3d 1469, 1471-72 (9th Cir. 1993), or 

may determine whether a jury trial is available, see, e.g., Blake 

v. Unionmutual Stock Life Ins. Co., 906 F.2d 1525, 1526 (11th 

Cir. 1990).

We are uncertain which of these boggarts has captured

the minds of the protagonists in this case. But exploring that

question does not strike us as a prudent use of scarce judicial

resources. Given the marshalled realities the parties agree

4

that the ERISA difference is of potential significance here; they

successfully persuaded the district court to that view; and it is

entirely plausible under the circumstances of this case that the

applicability vel non of ERISA makes a meaningful difference we 

refrain from speculation about the parties' tactical goals and

proceed directly to a determination of whether the court below

correctly concluded that state law provides the rule of decision.

B. Standard of Review. B. Standard of Review. 

The question of whether ERISA applies to a particular

plan or program requires an evaluation of the facts combined with

an elucidation of the law. See, e.g., Kulinski v. Medtronic Bio- 

Medicus, Inc., 21 F.3d 254, 256 (8th Cir. 1994) (explaining that 

the existence of an ERISA plan is a mixed question of fact and

law); Peckham v. Gem State Mut., 964 F.2d 1043, 1047 n.5 (10th 

Cir. 1992) (similar). For purposes of appellate review, mixed

questions of fact and law ordinarily fall along a degree-of-

deference continuum, ranging from plenary review for law-

dominated questions to clear-error review for fact-dominated

questions. See In re Extradition of Howard, 996 F.2d 1320, 1327- 

28 (1st Cir. 1993). Plenary review is, of course,

nondeferential, whereas clear-error review is quite deferential.

See id. Both standards are in play here. 

The interpretation of a regulation presents a purely

legal question, sparking de novo review. See, e.g., Strickland 

v. Commissioner, Me. Dep't of Human Serv., 48 F.3d 12, 16 (1st 

Cir. 1994); Liberty Mut. Ins. Co. v. Commercial Union Ins. Co., 

5

978 F.2d 750, 757 (1st Cir. 1992). Once the meaning of the

regulation has been clarified, however, the "mixed" question that

remains the regulation's applicability in a given case may

require factfinding, and if it does, that factfinding is reviewed

only for clear error. To that extent, the existence of an ERISA

plan becomes primarily a question of fact. See Wickman v. 

Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir.), 

cert. denied, 498 U.S. 1013 (1990); Kanne v. Connecticut Gen. 

Life Ins. Co., 867 F.2d 489, 492 (9th Cir. 1988), cert. denied, 

492 U.S. 906 (1989).

C. Statutory and Regulatory Context. C. Statutory and Regulatory Context. 

Congress enacted ERISA to protect the interests of

participants in employee benefit plans (including the interests

of participants' beneficiaries). See 29 U.S.C. 1001(a) & (b); 

see also Curtiss-Wright Corp. v. Schoonejongen, 115 S. Ct. 1223, 

1230 (1995); Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 15-16 

(1987). ERISA safeguards these interests in a variety of ways,

e.g., by creating comprehensive reporting and disclosure

requirements, see 29 U.S.C. 1021-1031, by setting standards of 

conduct for fiduciaries, see id. 1101-1114, and by 

establishing an appropriate remedial framework, see id. 1131- 

1145. An integral part of the statutory scheme is a broadly

worded preemption clause that, in respect to covered employee

benefit plans, sets to one side "all laws, decisions, rules,

regulations, or other State action having the effect of law, of

any State." Id. 1144(a). The purpose of the preemption clause 

6

is to enhance the efficient operation of the federal statute by

encouraging uniformity of regulatory treatment through the

elimination of state and local supervision over ERISA plans. See 

Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990); McCoy, 

950 F.2d at 18.

For an employee welfare benefit plan or program to come

within ERISA's sphere of influence, it must, among other things,

be "established or maintained" by an employer,1 an employee

organization, or both. See 29 U.S.C. 1002(1); see also 

Wickman, 908 F.2d at 1082 (enumerating necessary components of an 

ERISA plan); Donovan v. Dillingham, 688 F.2d 1367, 1370 (11th 

Cir. 1982) (en banc)(same). The parties agree that the group

insurance program that CIGNA wrote for Watts' employees, covering

accidental death, dismemberment, and permanent disability,

qualifies as a "program" of employee welfare benefits as that

term is used in the statute. See generally 29 U.S.C. 1002(1). 

Hence, the ERISA question reduces to whether the program is one

"established or maintained" by an employer. 

To address this very requirement, the Secretary of

Labor, pursuant to 29 U.S.C. 1135 (authorizing the Secretary to

promulgate interpretive regulations in the ERISA milieu),

promulgated a safe harbor regulation describing when (and to what

extent) an employer or a trade union may be involved with an

 

1The statute also requires that the employer be "engaged in
commerce" or in an industry or activity affecting commerce. 29
U.S.C. 1003(2). It is undisputed that Watts meets this
criterion. 

7

employee welfare benefit program without being deemed to have

"established or maintained" it. See 40 Fed. Reg. 34,527 (1975) 

(explaining the rationale underlying the safe harbor regulation);

see also Silvera v. Mutual Life Ins. Co., 884 F.2d 423, 426 (9th 

Cir. 1989); see generally Ronald J. Cooke, ERISA Practice and 

Procedure 2.06 (1994). The regulation provides in relevant 

part that the term 

"employee welfare benefit plan" shall not
include a group or group-type insurance
program offered by an insurer to employees or
members of an employee organization, under
which:

(1) No contributions are made by an employer
or employee organization;

(2) Participation [in] the program is
completely voluntary for employees or
members;

(3) The sole functions of the employer or
employee organization with respect to the
program are, without endorsing the program,
to permit the insurer to publicize the
program to employees or members, to collect
premiums through payroll deductions or dues
checkoffs and to remit them to the insurer;
and

(4) The employer or employee organization
receives no consideration in the form of cash
or otherwise in connection with the program,
other than reasonable compensation, excluding
any profit, for administrative services
actually rendered in connection with payroll
deductions or dues checkoffs.

29 C.F.R. 2510.3-1(j). A program that satisfies the

regulation's standards will be deemed not to have been

"established or maintained" by the employer. The converse,

however, is not necessarily true; a program that fails to satisfy

8

the regulation's standards is not automatically deemed to have

been "established or maintained" by the employer, but, rather, is

subject to further evaluation under the conventional tests. See 

Hansenv. Continental Ins. Co., 940 F.2d 971, 976 (5th Cir. 1991). 

Here, we need not proceed beyond the regulation itself.

The safe harbor dredged by the regulation operates on the premise

that the absence of employer involvement vitiates the necessity

for ERISA safeguards. In theory, an employer can assist its work

force by arranging for the provision of desirable coverage at

attractive rates, but, by complying with the regulation, assure

itself that, if it acts only as an honest broker and remains

neutral vis-a-vis the plan's operation, it will not be put to the

trouble and expense that meeting ERISA's requirements entails.

Failure to fulfill any one of the four criteria listed in the

regulation, however, closes the safe harbor and exposes a group

insurance program, if it otherwise qualifies as an ERISA program,

to the strictures of the Act. See Qualls v. Blue Cross of Cal., 

Inc., 22 F.3d 839, 843 (9th Cir. 1994); Fugarino v. Hartford Life 

& Accident Ins. Co., 969 F.2d 178, 184 (6th Cir. 1992), cert. 

denied, 113 S. Ct. 1401 (1993); Memorial Hosp. Sys. v. Northbrook 

Life Ins. Co., 904 F.2d 236, 241 n.6 (5th Cir. 1990); Kanne, 867 

F.2d at 492.

In the instant case, the first, second, and fourth

criteria are not in dispute. Plaintiff paid the premium without

the employer's financial assistance; the decision to purchase the

coverage was his and his alone; and Watts received no forbidden

9

consideration. We concentrate, therefore, on the regulation's

third facet. This is a fitting focus, as the Department of Labor

has called the employer neutrality that the third facet evokes

"the key to the rationale for not treating such a program as an

employee benefit plan . . . ." 40 Fed. Reg. 34,526.

In dealing with the regulation, courts have echoed the

agency's view of the importance of employer neutrality. See, 

e.g., Hensley v. Philadelphia Life Ins. Co., 878 F. Supp. 1465, 

1471 (N.D. Ala. 1995); du Mortier v. Massachusetts Gen. Life Ins. 

Co., 805 F. Supp. 816, 821 (C.D. Cal. 1992). But as the 

regulation itself indicates, remaining neutral does not require

an employer to build a moat around a program or to separate

itself from all aspects of program administration. Thus, as long

as the employer merely advises employees of the availability of

group insurance, accepts payroll deductions, passes them on to

the insurer, and performs other ministerial tasks that assist the

insurer in publicizing the program, it will not be deemed to have

endorsed the program under section 2510.3-1(j)(3). See Kanne, 

867 F.2d at 492; du Mortier, 805 F. Supp. at 821. It is only 

when an employer purposes to do more, and takes substantial steps

in that direction, that it offends the ideal of employer

neutrality and brings ERISA into the picture. See, e.g., Kanne, 

867 F.2d at 492-93 (holding that an employer group crossed the

line when it established a trust entity in its name for purposes

of plan administration); Brundage-Peterson v. Compcare Health 

Servs. Ins. Corp., 877 F.2d 509, 510-11 (7th Cir. 1989) (finding 

10

that an employer who determined eligibility, contributed

premiums, and collected and remitted premiums paid for dependents

did not qualify for the safe harbor exemption); Shiffler v. 

Equitable Life Assur. Soc. of U.S., 663 F. Supp. 155, 161 (E.D. 

Pa. 1986) (finding that an employer that touted a group policy to

employees as part of its customary benefits package, and that

specifically endorsed the policy, did not qualify for the safe

harbor exemption), aff'd, 838 F.2d 78 (3d Cir. 1988). This case 

falls between these extremes, and requires us to clarify the

standard for endorsement under section 2510.3-1(j)(3). 

The Department of Labor has linked endorsement of a

program on the part of an employee organization to its engagement

"in activities that would lead a member reasonably to conclude

that the program is part of a benefit arrangement established or

maintained by the employee organization." Dep't of Labor Op. No.

94-26A (1994).2 What is sauce for the goose is sauce for the

gander. Thus, we believe that the agency, in a proper case, will

link endorsement on an employer's part to its engagement in

activities that would lead a worker reasonably to conclude that a

particular group insurance program is part of a benefit

arrangement backed by the company.

This conclusion is bolstered by the Department's stated

rationale to the effect that a communication to employees
 

2Opinion letters issued by the Secretary of Labor are not
controlling even in the cases for which they are authored. See 
Reich v. Newspapers of New Eng., Inc., 44 F.3d 1060, 1070 (1st 
Cir. 1995). Nonetheless, courts may derive guidance from them.
See id. 

11

indicating that an employer has arranged for a group or group-

type insurance program would constitute an endorsement within the

meaning of section 2510.3-1(j)(3) if, taken together with other

employer activities, it leads employees reasonably to conclude

that the program is one established or maintained by the

communicator. See id.; see also 40 Fed. Reg. 34,526 (explaining 

that the current phrasing of the safe harbor provision replaced

an earlier version requiring that the employer make no

representation to its employees that the insurance program is a

benefit of employment because critics found the earlier version

"too vague and difficult to apply"). In short, the agency has

suggested that the employees' viewpoint should constitute the

principal frame of reference in determining whether endorsement

occurred.

The interpretation of the safe harbor regulation by the

agency charged with administering and enforcing ERISA is entitled

to substantial deference. See Berkshire Scenic Ry. Museum, Inc. 

v. ICC, 52 F.3d 378, 381-82 (1st Cir. 1995); Keyes v. Secretary 

of the Navy, 853 F.2d 1016, 1021 (1st Cir. 1988). Here, 

moreover, the respect usually accorded an agency's interpretation

of a statute is magnified since the agency is interpreting its

own regulation. See Arkansas v. Oklahoma, 503 U.S. 91, 112 

(1992); Puerto Rico Aqueduct & Sewer Auth. v. United States EPA, 

35 F.3d 600, 604 (1st Cir. 1994), cert. denied, 115 S. Ct. 1096 

(1995). So long as the agency's interpretation does not do

violence to the purpose and wording of the regulation, or

12

otherwise cross into forbidden terrain, courts should defer. See 

Martin v. OSHRC, 499 U.S. 144, 150 (1991); see also Stinson v. 

United States, 113 S. Ct. 1913, 1919 (1993) (holding that an 

agency's interpretation of its own regulations must be given

controlling weight unless plainly erroneous, inconsistent with a

federal statute, or unconstitutional); Kelly v. United States, 

924 F.2d 355, 361 (1st Cir. 1991) (similar).

In this instance, we believe that deference is due.

The Secretary's sense of the safe harbor regulation is consonant

with both the regulation's text and the overlying statute. And,

moreover, looking at the employer's conduct from the employees'

place of vantage best ensures that employer neutrality remains a

reality rather than a mere illusion. Phrased another way,

judging endorsement from the viewpoint of an objectively

reasonable employee most efficaciously serves ERISA's fundamental

objective: the protection of employee benefit plan participants

and their beneficiaries.

We rule, therefore, that an employer will be said to

have endorsed a program within the purview of the Secretary's

safe harbor regulation if, in light of all the surrounding facts

and circumstances, an objectively reasonable employee would

conclude on the basis of the employer's actions that the employer

had not merely facilitated the program's availability but had

exercised control over it or made it appear to be part and parcel

of the company's own benefit package.

D. Analysis. D. Analysis. 

13

Here, the district court interpreted the regulation

correctly and concluded that the company had not endorsed the

group insurance program. This conclusion is fact-driven, and,

thus, reviewable only for clear error.3 See Cumpiano v. Banco 

Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990); see also Fed. 

R. Civ. P. 52(a). Thus, the trier's findings of fact cannot be

set aside unless, on reviewing all the evidence, the court of

appeals is left with an abiding conviction that a mistake has

been committed. See Dedham Water Co. v. Cumberland Farms Dairy, 

Inc., 972 F.2d 453, 457 (1st Cir. 1992); Cumpiano, 902 F.2d at 

152-153. Applying this deferential standard, we cannot say that

the trial court's "no endorsement" finding is clearly erroneous.

The anatomy of the court's determination is

instructive. Based primarily on the testimony of two corporate

officials Watts' benefits administrator and Webster Valve's

employee relations manager the court found that the company had

 

3The question of endorsement vel non is a mixed question of 
fact and law. In some cases the evidence will point unerringly
in one direction so that a rational factfinder can reach but one
conclusion. In those cases, endorsement becomes a matter of law.
Cf. Griffin v. United States, 502 U.S. 46, 55 n.1 (1991) 
(discussing "adequacy on the proof as made" as meaning not
whether the evidence sufficed to enable an alleged fact to be
found, but, rather, whether the facts adduced at trial sufficed
in law to support a verdict); Anderson v. Liberty Lobby, Inc., 
477 U.S. 242, 251-52 (1986) (describing the appropriate mode of
inquiry for directed verdicts and summary judgments). In other
cases, the legal significance of the facts is less certain, and
the outcome will depend on the inferences that the factfinder
chooses to draw. See, e.g., TSC Indus., Inc. v. Northway, Inc., 
426 U.S. 438, 450 (1976); In re Varasso, 37 F.3d 760, 763 (1st 
Cir. 1994). In those cases, endorsement becomes a question of
fact. This case is of the latter type.

14

made its employees aware of the opportunity to obtain coverage,

but had stopped short of endorsing the program. CIGNA drafted

the policy and, presumably, set the premium rates. Although

Watts distributed the sales brochure, waiver-of-insurance cards,

and enrollment cards, those efforts were undertaken to help CIGNA

publicize the program; the documents themselves were prepared and

printed by CIGNA, and delivered by it to Watts for distribution.

Watts recommended enrollment via a cover letter (reproduced as an

appendix hereto) written on the letterhead of Watts Industries

and signed by its vice-president for financial matters. CIGNA

typeset the letter and incorporated it into the cover page of the

brochure. The letter explicitly informed Watts' employees that

the enrollment decision was theirs to make. Watts nowhere

suggested that it had any control over, or proprietary interest

in, the group insurance program. And, finally, neither the

letter nor any other passage in the brochure mentioned ERISA.

The district court also examined Watts' other

activities concerning the program. Watts collected premiums

through payroll deductions, remitted the premiums to CIGNA,

issued certificates to enrolled employees confirming the

commencement of coverage, maintained a list of insured persons

for its own records, and assisted CIGNA in securing appropriate

documentation when claims eventuated. Watts' activities in this

respect consisted principally of filling out the employer portion

of the claim form, inserting statistical information maintained

in Watts' personnel files (such as the insured's name, address,

15

age, classification, and date of hire), making various forms

available to employees (e.g., claim forms),4 and keeping track

of employee eligibility. Watts would follow up on a claim to

determine its status, if CIGNA requested that Watts do so, and

would occasionally answer a broker's questions about a claim. In

sum, Watts performed only administrative tasks, eschewing any

role in the substantive aspects of program design and operation.

It had no hand in drafting the plan, working out its structural

components, determining eligibility for coverage, interpreting

policy language, investigating, allowing and disallowing claims,

handling litigation, or negotiating settlements.

In the last analysis, the district court found that

Watts' cover letter fell short of constituting an endorsement.

The court pointed out that neither the letter nor the brochure

expressly stated that the employer endorsed the program. Apart

from the letter, the court concluded that Watts had performed

only ministerial activities, and that these activities (whether

viewed alone or in conjunction with the cover letter) did not

rise to the level of an endorsement.

We believe that this finding deserves our allegiance.

Drawing permissible inferences from the evidence, the trial court

could plausibly conclude on this scumbled record that an

objectively reasonable employee would not have thought that Watts

endorsed the group insurance program. Several considerations

 

4CIGNA prepared and printed all such forms, and sent a
supply of forms to Watts.

16

lead us in this direction. We offer a representative sampling.

First, we think that endorsement of a program requires

more than merely recommending it. An employer's publicly

expressed opinion as to the quality, utility and/or value of an

insurance plan, without more, while relevant to (and perhaps

probative of) endorsement, will most often not indicate employer

control of the plan. Second, the administrative functions that

Watts undertook fit comfortably within the Secretary's

regulation. Activities such as issuing certificates of coverage

and maintaining a list of enrollees are plainly ancillary to a

permitted function (implementing payroll deductions). Activities

such as answering brokers' questions similarly can be viewed as

assisting the insurer in publicizing the plan. Other activities

that arguably fall closer to the line, such as the tracking of

eligibility status, are completely compatible with the

regulation's aims. Under the circumstances, the court lawfully

could find that the employer's activities, in the aggregate, did

not take the case out of the safe harbor.5 See, e.g., Brundage- 
 

5Appellants stress the fact that Watts unilaterally prepared
and filed a Form 5500 with the Internal Revenue Service. This is
an example of the mountain laboring, but bringing forth a mouse.
Such forms are informational in nature and are designed to comply
with various reporting requirements that ERISA imposes. See 
Cooke, supra, 3.10, at 3-34. But, there is no evidence to 
suggest that Watts' employees knew of this protective filing, and
it is surpassingly difficult for us to fathom how the filing
makes a dispositive difference. Although the inference that
compiling the tax form demonstrated Watts' intent to provide an
ERISA plan does not escape us, but cf. Kanne, 867 F.2d at 493 
(explaining that a brochure describing a plan as an ERISA plan
evidences the intent of the employer to create an ERISA plan, but
the same may not be said of the filing of a tax return), it is
entirely possible, as the plaintiff suggests, that the form was

17

Peterson, 877 F.2d at 510 (assuming that steps such as 

"distributing advertising brochures from insurance providers, or

answering questions of its employees concerning insurance, or

even deducting the insurance premiums from its employees'

paychecks and remitting them to the insurers," do not force

employers out of the safe harbor provision); du Mortier, 805 F. 

Supp. at 821 (holding that activities such as maintaining a file

of informational materials, distributing forms to employees, and

submitting completed forms to the insurer, do not transcend the

boundaries of the safe harbor).

In arguing for reversal, appellants rely on Hansen v. 

Continental Ins. Co., a case that involved a similar situation. 

In Hansen, as here, participation in the plan was voluntary, and 

premiums were paid by the employees via payroll deduction. See 

Hansen, 940 F.2d at 973. The employer collected the premiums, 

remitted them to the insurer, and employed an administrator who

accepted claim forms and transmitted them to the carrier. See 

id. at 974. In addition, the employees received a booklet 

embossed with the employer's corporate logo that described the

plan and encouraged employee participation. The court found that

the company had endorsed the plan. See id. 

Despite the resemblances, there are two critical facts

that distinguish Hansen from the case at bar. First, in Hansen 

the corporate logo was embossed on the booklet itself, see id., 
 

filed merely as a precaution. In any event, this case turns on
the employer's activities, not its intentions.

18

making it appear that the employer vouched for the entire

brochure (and for the plan). Here, however, only Watts' letter

bore its imprimatur. Second, and perhaps more cogent, the

booklet at issue in Hansen described the policy as the company's 

plan, see id. ("our plan"), while here, the letter typeset onto 

the booklet describes the policy as a plan offered by another

organization.6 Though the appellants decry the distinction as

merely a matter of semantics, words are often significant in

determining legal rights and obligations. See generally Felix 

Frankfurter, Some Reflections on the Reading of Statutes 29 

(1947) ("Exactness in the use of words is the basis of all

serious thinking.").

In the difference between "our plan" and "a plan" lies

the quintessential meaning of endorsement. If a plan or program

is the employer's plan or program, the safe harbor does not

beckon. See, e.g., Sorel v. CIGNA, 1994 WL 605726, at *2 (D.N.H. 

Nov. 1, 1994) (holding that statement describing policy as

employer's plan on first page of plan description indicates

endorsement); Cockey v. Life Ins. Co. of N. Am., 804 F. Supp. 

1571, 1575 (S.D. Ga. 1992) (finding that when employer presents a

program to its employees as an integral part of its own benefits
 

6There may also be a critical difference between our
approach to the question of endorsement and that adopted in
Hansen. Although the Hansen court did not articulate its ratio 
decidendi, at least one district court has come to the conclusion 
that Hansen analyzed the situation from the standpoint of the 
employer rather than the employee. See Barrett v. Insurance Co. 
of N. Am., 813 F. Supp. 798, 800 (N.D. Ala. 1993). This 
possibility renders appellants' reliance on Hansen even more 
problematic.

19

package, the safe harbor is unavailable); Shiffler, 663 F. Supp. 

at 161 (finding endorsement because policy had been hawked to

employees as a part of the company's benefits package); see also 

Dep't of Labor Op. No. 94-26A, supra (advising that safe harbor 

is unavailable when a union, inter alia, describes a group 

insurance program as its program). When, however, the employer

separates itself from the program, making it reasonably clear

that the program is a third party's offering, not subject to the

employer's control, then the safe harbor may be accessible. See 

Hansen, 940 F.2d at 977; Kanne, 867 F.2d at 493; Hensley, 878 F. 

Supp. at 1471.

This distinction is sensible. When an objectively

reasonable employee reads a brochure describing a program as

belonging to his employer, he is likely to conclude that, if he

participates, he will be dealing with the employer and that he

will therefore enjoy the prophylaxis that ERISA ensures in such

matters. When the possessive pronoun is eliminated in favor of a

neutral article, however, the employee's perception is much more

likely to be that, if he participates, he will be dealing

directly with a third party the insurer and that he will

therefore be beyond the scope of ERISA's protections.

To sum up, we are drawn to three conclusions. First,

the district court did not clearly err in finding that Watts had

not endorsed the group insurance program. Second, the court's

fact-sensitive determination that the program fits within the

parameters of the Secretary's safe harbor regulation is

20

sustainable. Third, since ERISA does not apply, the court below

did not blunder in scrutinizing the merits of plaintiff's

contract claim through the prism of state law.

III. THE DISABILITY ISSUE III. THE DISABILITY ISSUE

Appellant asseverates that, even if New Hampshire law

controls, the judgment below is insupportable. We turn now to

this asseveration.

The starting point for virtually any claim under a

policy of insurance is the policy itself. Here, the applicable

rider promises benefits to an insured who has been injured in an

accident, whose ensuing disability is "continuous" and "total"

for a year, and who thereafter remains "permanently and totally

disabled." The rider defines "continuous total disability" as a

disability resulting from injuries sustained in an accident,

"commencing within 180 days after the date of the accident,"

lasting for at least a year, and producing during that interval

"the Insured's complete inability to perform every duty of his

occupation."

If an insured meets this benchmark, he must then prove

that he is "permanently and totally disabled." Under the policy

definitions, this phrase signifies "the Insured's complete

inability, after one year of continuous total disability, to

engage in an occupation or employment for which [he] is fitted by

reason of education, training, or experience for the remainder of

his life." It is against this linguistic backdrop that we

inspect appellants' assertion that the trial court erred in

21

finding plaintiff to be totally and permanently disabled.

A. Standard of Review. A. Standard of Review. 

In actions that are tried to the court, the judge's

findings of fact are to be honored unless clearly erroneous,

paying due respect to the judge's right to draw reasonable

inferences and to gauge the credibility of witnesses. See 

Cumpiano, 902 F.2d at 152 (citing Fed. R. Civ. P. 52(a)); 

Reliance Steel Prods. Co. v. National Fire Ins. Co., 880 F.2d 

575, 576 (1st Cir. 1989). A corollary of this proposition is

that, when there are two permissible views of the evidence, the

factfinder's choice between them cannot be clearly erroneous.

See Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985); 

Cumpiano, 902 F.2d at 152. In fine, when a case has been decided 

on the facts by a judge sitting jury-waived, an appellate court

must refrain from any temptation to retry the factual issues

anew.

There are, of course, exceptions to the rule. For

example, de novo review supplants clear-error review if, and to

the extent that, findings of fact are predicated on a mistaken

view of the law. See, e.g., United States v. Singer Mfg. Co., 

374 U.S. 174, 195 n.9 (1963); RCI N.E. Servs. Div. v. Boston 

Edison Co., 822 F.2d 199, 203 (1st Cir. 1987). This does not 

mean, however, that the clearly erroneous standard can be eluded

by the simple expedient of creative relabelling. See Cumpiano, 

902 F.2d at 154; Reliance Steel, 880 F.2d at 577. For obvious 

reasons, we will not allow a litigant to subvert the mandate of

22

Rule 52(a) by hosting a masquerade, "dressing factual disputes in

`legal' costumery." Reliance Steel, 880 F.2d at 577; accord Dopp 

v. Pritzker, 38 F.3d 1239, 1245 (1st Cir. 1994), cert. denied, 

115 S. Ct. 1959 (1995).

B. Analysis. B. Analysis. 

Appellants make two main arguments in regard to

plaintiff's disability claim. First, in an effort to skirt Rule

52(a), they assert that the district court committed an error of

law, mistaking the meaning of the phrase "permanently and totally

disabled" as that phrase is used in the policy. We reject the

assertion as comprising nothing more than a clumsy attempt to

recast a clear-error challenge as an issue of law in hope of

securing a more welcoming standard of review. The policy itself

defines the operative term, and the record makes pellucid that

the district judge applied the term within the parameters of that

definition.

Appellants' second contention posits that the district

court misperceived the facts, and that plaintiff was not

sufficiently disabled to merit an award of benefits. This

contention also lacks force. The district court had adequate

grounds for deciding that plaintiff was totally and permanently

disabled. The evidence showed that plaintiff sustained a

devastating brain injury, and that, throughout the year following

his accident, a number of physicians found his disability to be

continuous. By and large, plaintiff's condition did not improve

significantly during that year (or thereafter, for that matter).

23

Without exception, the doctors concluded that he could never

return to work as a forklift driver. To cap matters, the record

contains ample evidence that the plaintiff's disability was

permanent and blanketed the universe of occupations to which

plaintiff a laborer with a high-school education might have

aspired.

We need not cite book and verse. The court made

detailed findings, crediting the conclusions of four doctors who

judged plaintiff to be severely impaired, both mentally and

physically.7 The court also credited an evaluation performed by

Sherri Krasner, a speech and language pathologist, and the

testimony of a vocational rehabilitation counselor, Arthur

Kaufman, who offered an opinion that plaintiff was unable to work

without constant supervision. Kaufman stated that he did not

know of a job suitable for a person in plaintiff's condition.8
 

7These experts included the attending physician (Dr.
Martino), a neurologist (Dr. Whitlock), a clinical
neuropsychologist (Dr. Higgins), and a psychologist (Dr. Toye).
A fifth physician, Dr. Michele Gaier-Rush, also evaluated
plaintiff. CIGNA chose Dr. Gaier-Rush as its medical examiner
but neglected to provide her with any of plaintiff's plentiful
prior medical records, despite their availability. She concluded
that plaintiff could not perform his usual job but could perform
a job "requiring more mental capacity than physical capacity."
She noted, however, that plaintiff had no formal training beyond
high school, and conceded that "[t]his will probably be a
permanent disability as there does not seem to have been a
significant improvement in the past year." Consequently, she
found it doubtful that plaintiff could ever work again.

8While Kaufman did say that plaintiff might be able to do
some gainful employment with "excessive supervision," and that
plaintiff, like other patients with traumatic brain injuries,
would probably benefit from vocational rehabilitation, Kaufman
expressed doubt that plaintiff would ever overcome his
impairment. In short, he lacked the "capacity to retain . . .

24

On this record, the trial court's total disability finding is

unimpugnable.

Another wave of appellants' evidentiary attack targets

the district court's finding that plaintiff's disability is

permanent. In this respect, appellants rely mainly on the

physicians' recommendations for rehabilitative therapy as

indicative of the potential for recovery. The district court,

however, found appellants' inference unreasonable in light of the

dim prospects for significant recovery, the duration of

plaintiff's inability to work, and the policy's failure to

require vocational rehabilitation as a precondition to the

receipt of benefits. These are fact-dominated issues, and the

trial court is in the best position to calibrate the decisional

scales. See Cumpiano, 902 F.2d at 152. Having examined the 

record with care, we have no reason to suspect that a mistake was

committed. See, e.g., Duhaime v. Insurance Co., 86 N.H. 307, 308 

(1933) (explaining that, to be permanently disabled, an insured

need not be in a condition of "utter hopelessness").

IV. CONCLUSION IV. CONCLUSION

We need go no further. ERISA does not apply to the

group insurance program at issue here. Moreover, the district

court's factual findings survive clear-error review.

Consequently, the court's resolution of the case stands.

 

employment."

25

Affirmed. Affirmed. 

26